STATE of Missouri, Plaintiff–
Respondent,

v.

Ronald Gene BOYD, Defendant–
Appellant.

Ronald Gene BOYD, Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

Nos. 17321, 17927.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 8, 1992.

Motion for Rehearing or Transfer
Denied Dec. 30, 1992.

J. Gregory Mermelstein, Columbia, for Ronald Gene Boyd.

William L. Webster, Atty. Gen., Robert Alan Kelly, Asst. Atty. Gen., Jefferson City, for State.

SHRUM, Judge.

The defendant Ronald Gene Boyd was found guilty by a jury of the class C felonies of burglary in the second degree, § 569.170, RSMo 1986, and stealing, § 570.-030, RSMo 1986, and sentenced by the trial court as a prior and persistent offender, § 558.016, to two consecutive terms of ten years' imprisonment. He appealed in our case No. 17321.

The defendant sought postconviction relief pursuant to Rule 29.15.[1] In his pro se motion he alleged his trial attorney was ineffective because he "failed to properly investigate ... defense witnesses and failed to call defense witnesses...."

A public defender, appointed to represent the defendant, filed an unverified amended motion. At an August 17, 1990, hearing, the motion court denied the appointed lawyer's request that the defendant be allowed to verify the amended motion. The hearing proceeded on the original motion, and the motion court denied relief. The defendant appealed in our case No. 17178, which was consolidated with the appeal from his convictions, case No. 17321. We reversed the order denying postconviction relief and remanded for a motion court determination of whether postconviction counsel met the requirements of Rule 29.15(e). We suspended the appeal of the convictions. *See State v. Boyd,* 816 S.W.2d 19 (Mo.App. 1991).

On November 13, 1991, the motion court conducted a second hearing, limited solely to the issue of abandonment by postconviction counsel. The motion court denied relief, after concluding that postconviction

---

1. For convenience, we continue to refer to Ronald Gene Boyd, movant under Rule 29.15, as "the defendant."

counsel performed as required by Rule 29.-15(e). The defendant appealed in our case No. 17927, which we have consolidated with case No. 17321.

In case No. 17321, the defendant contends the trial court abused its discretion in overruling his motion for a continuance so that he might hire private counsel. In case No. 17927, the defendant contends the motion court erred in denying postconviction relief, arguing that he received ineffective assistance of trial counsel and that he was abandoned by his postconviction counsel.

We affirm in both cases.

## CASE NO. 17321

### Facts

The defendant does not challenge the sufficiency of the evidence to convict him. Here we recite only those facts necessary for resolution of his appeal of his convictions. We set forth additional facts in our discussion of the defendant's appeal from the denial of postconviction relief.

This case originated in Barton County; it was transferred to Dade County upon the defendant's motion for a change of venue. On December 14, 1989, the date originally set for trial, the defendant, represented by the public defender, filed a motion for a continuance, giving three reasons: his desire to hire private counsel, the absence in the record of a written report of his mental examination, and the need for further investigation of alibi witnesses. Because of the absence of the mental examination report, the trial court granted the continuance. At that time, the trial judge stated to the defendant that if he desired private counsel, "I suggest you get busy doing it at this time, because when this case is again set for trial, I will not view favorably a request for another continuance to hire private counsel." The court set February 15, 1990, as the new date for trial.

At a pre-trial hearing on February 15, the defendant sought another continuance, offering as one reason his desire to hire private counsel. At the hearing, the defendant testified about his attempts to obtain a private attorney. Summarized, his testimony was that he had been incarcerated in the Dade County jail approximately two and one-half months; that he had been attempting since November 1989 to hire private counsel; that certain persons had agreed to provide financial assistance to enable him to hire private counsel, but when he wrote them concerning money they did not respond; and that personnel of the Dade County Sheriff's Department refused his requests to use the telephone to contact persons who would provide money to him. Portions of the defendant's testimony are set out marginally.[2]

The trial court denied the request for a continuance. Immediately thereafter, a

2. Q. (by defense counsel): What did you do with regard to hiring private counsel?
   A. My girlfriend called several attorneys and found out how much money was needed to seek counsel, and I got a couple of different people willing to put up part of the money to get my counsel. One of my people that was going to do this has moved to Joplin recently.
   Q. Who is that?
   A. Deana Wise, had moved to Joplin. I talked to her approximately three weeks ago—two weeks ago, and everything was final on that part, she was willing to help me out. I've written letters out to different people such as Tracie Ershom [phonetic] and Deana, I haven't got no answers back on them letters. But any other letter that I write pertaining to "Hi, how are you doing," gets answered. But every letter that I write concerning money has not been answered. I've had numerous attempts to get on the phone to make calls; I'm unable to get the phone calls that I ask for. I've asked lots of times to call you, for instance, and I haven't gotten none of

them phone calls. Two, since I have been here. I've written letters, two letters after my last hearing here pertaining to getting the judge's address so I could write to him and let him be aware of what was going on about me not getting the phone calls, I felt I was getting in—my counsel wasn't working for me as I was asking. I've asked numerous things, I've told you about the letters and the phone calls.

.  .  .  .

   Q. Is there anything else you can tell the judge that might be relevant to this issue that I haven't asked you about?
   A. Other than me not being able to get in personal contact with these people, no. Just here in the last week, I have had one visit from somebody that would be willing to help me with money. It wasn't discussed this last Sunday, but I'm sure there's no problem with it. I plan on writing him a letter to talk to him about it. He's supposed to be here today, the way I understand it.

jury was selected, the trial was conducted, and the defendant was convicted.

### Discussion and Decision

■ The defendant contends the trial court "abused its discretion in overruling [his] motion for a continuance so that he could hire private counsel because the failure to grant the continuance denied [him] his rights to due process of law and to effective assistance of counsel ... in that [he] was forced to go to trial with inadequate counsel...."

■ A trial court's discretion in deciding whether to grant a continuance to allow a defendant a choice of attorney has been described as "vast," *State v. Smith*, 607 S.W.2d 737, 738[1] (Mo.App.1980), and to prove trial court abuse of discretion in denying a motion for a continuance requires a "very strong showing." *State v. Cuckovich*, 485 S.W.2d 16, 21–22[8] (Mo.banc 1972). The constitutional right to counsel does not mean that an accused is entitled to a particular attorney, *State v. Turner*, 623 S.W.2d 4, 11[11] (Mo.banc 1981), *cert. denied*, 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982), and an "accused's right to private counsel is limited by the state's right to proceed to trial after the accused has been afforded a fair opportunity to engage his own counsel and adequate time to prepare his defense, and does not include the right to defeat or impede the orderly processes of the administration of justice." *State v. Crider*, 451 S.W.2d 825, 828[4] (Mo.1970). *See also State v. Wilson*, 816 S.W.2d 301, 304[4, 5] (Mo.App.1991). "It is only where the accused can justify the need to change counsel and can demonstrate that he was not dilatory in seeking other representation that he can be entitled to a continuance on the day set for trial in order to obtain different counsel." *State v. Gaskin*, 618 S.W.2d 620, 626[9] (Mo.1981), *vacated on other grounds sub nom. Missouri v. Haggard*, 459 U.S. 1192–93, 103 S.Ct. 1171–72, 75 L.Ed.2d 423–24 (1983).

The defendant decided as early as November 1989 that he wanted to hire private counsel. On December 14 the trial judge advised the defendant that if he was going to hire his own lawyer, he had to do so by February 15, 1990, the rescheduled trial date, and warned him that on that date he would "not view favorably a request for another continuance to hire private counsel."

The defendant argues he was diligent in his efforts to obtain private counsel. He asserts that he had obtained "initial commitments from Wise and Ershom to put up money for this purpose." Based on the record, this assertion is conjectural, at best. The defendant testified that Deana Wise and Tracie Ershom had agreed to supply "part of the money." The defendant also said that he planned to write an unnamed person who had visited him during the week prior to trial who "would be willing to help me with money." The defendant admitted that earlier letters he had written concerning money had gone unanswered. There is nothing else in the record to indicate the defendant had any likelihood of obtaining private counsel if he were given more time. The trial court did not abuse its discretion in refusing to grant the continuance.

■ The defendant also argues that the trial court's refusal to grant a continuance denied him his right to effective assistance of counsel, citing *Turner*, 623 S.W.2d at 11[10], for the proposition that the trial court's discretion in making its ruling "should not be lightly disturbed when it appears the defendant was not denied skilled and competent representation." Because of our conclusion that the trial court did not abuse its discretion in denying a continuance, we need not consider, in case No. 17321, the defendant's various allegations of ineffective assistance of trial counsel.[3]

---

**3.** Despite the *Turner* passage cited by the defendant, we question whether the applicable abuse of discretion standard of review is compatible with the hindsight approach that would attend an examination of the trial court ruling in light of trial counsel's performance subsequent to the ruling. It is true, of course, that if an appellate court concludes that a trial court abused its discretion in refusing to allow a defendant a continuance to obtain other counsel, the defendant then faces the next step of showing that the error resulted in prejudice to his defense. *See, e.g., State v. Nave*, 694 S.W.2d 729, 735[4] (Mo. banc 1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct.

We affirm the judgment in case number 17321.

## CASE NO. 17927
## ISSUE ON APPEAL:

### TRIAL COUNSEL'S PERFORMANCE

*Facts*

*Trial Testimony*

Prior to reciting facts pertaining to the defendant's postconviction relief efforts, we summarize trial testimony essential to an understanding of the defendant's points on appeal.

The victim, Darrell McDonald, lived about five and one-half miles northwest of Golden City. He left his home about 5:30 p.m., August 27, 1988, to go to Joplin with a friend. Upon his return between 1:30 and 2:00 a.m., August 28, McDonald discovered two doors of his house standing open and several items of personal property missing. At trial, McDonald identified three of those items: a mounted deer head (state's exhibit 9) and two stereo speakers (state's exhibits 10 and 11).

Ralph Dunlap testified that on August 27 he and the defendant left Dunlap's Golden City residence in Dunlap's pickup truck when "[i]t was dark, it was late in the afternoon," and drove to a point a mile west of the McDonald residence where they parked the vehicle. They walked to the McDonald house, forced open the back door, and placed several items of property, including a deer head and two stereo speakers, outside the back door. They walked back to the truck, drove to the McDonald house, and loaded the property into the truck. They drove to Dunlap's residence where they unloaded the speakers and a television set and then went to the home of a Kathy Coats where they put the rest of the property in her basement. Asked how much time elapsed "from the time you left your trailer until you took the property back," Dunlap replied, "A couple of hours." At trial, Dunlap identified state's exhibits 9, 10, and 11, the deer head and stereo speakers, as property he and the defendant removed from the McDonald residence.

Coats testified that she and the defendant were living together in August 1988. On "the Saturday night of the Lamar fair in August of 1988," she and the defendant were at the Golden City home that Dunlap shared with a Glenda Lawson, both of whom were present. At a time "before dark ... maybe an hour or so," Dunlap and the defendant left in Dunlap's pickup truck. The pair returned "after dark" with a truck full of property that the defendant told Coats "he had stole...." At trial, Coats identified the mounted deer head as one of the items in the truckload of stolen property.

Ray Minor, Jr., testified that in September 1988 he rented a house to the defendant. Shortly thereafter Minor purchased a mounted deer head from the defendant. Minor identified state's exhibit 9 as the deer head he purchased from the defendant.

Barton County Sheriff William Griffitt and sheriff's department sergeant Daniel Dickey testified about their investigation of the crimes and the recovery of the stereo speakers from Dunlap's residence. Griffitt testified about his recovery of the deer head from Minor.

The defendant called two witnesses, his cousin Fred Forste and Forste's wife, Tammy. Both Forstes testified that on the night of the McDonald burglary and theft, the defendant and Coats accompanied them to the Barton County Fair on the square in Lamar. They arrived at the fair around 5:30 or 6:00 p.m. and remained there until around 8:00 p.m. when they went to Onstotts Bar, which was located on the square. The four remained at Onstotts until 11:30 or midnight at which time the Forstes transported the defendant and Coats to the Coats residence. On cross-examination, Fred Forste admitted he had been convicted of burglary in 1980.

1500, 89 L.Ed.2d 901 (1986). In the case before us, however, the question of trial counsel's effectiveness is solely a matter for postconviction relief proceedings.

*August 1990 Hearing Testimony*

At the August 1990 postconviction relief hearing, the only evidence the defendant offered was his testimony, which we summarize. After his preliminary hearing, the defendant furnished his trial counsel the names of three witnesses—Deana Wise, Gina Sidoti, and Tabitha Yardley—and told him he could obtain from a Perry Fowler a list of participants in an arm wrestling contest at the county fair.

The defendant told his trial counsel that Wise, Sidoti, and Yardley would testify that he returned to the residence he shared with Coats at or shortly after midnight and remained there the rest of the night.

The defendant's trial counsel obtained Fowler's list of arm wrestling contest participants, and the defendant checked off two names—Philip Reed and Jamey Carsel—as persons who "could have testified to the fact that they seen me around the arm wrestling contest when they was having that contest."

The defendant informed his trial counsel of the time period when he was in Onstotts Bar. He named two persons he said could corroborate the Forstes' testimony about his presence in the bar—Cindy Renfro and Rhonda LaGrand. The defendant spoke with Renfro at the bar; he did not give her name to counsel "until the trial date." He said LaGrand was at Onstotts when he was there; he said he advised trial counsel about LaGrand on December 14, 1989, the date originally set for the trial.

On cross-examination, the defendant said that on December 14, 1989, his trial counsel asked him to make a list of witnesses that he wanted counsel to talk to (in addition to the names marked on the Fowler list). The defendant named the Forstes, Fowler, and an Ed Miller, "because Eddie Miller was at the arm wrestling contest." The defendant also stated on cross-examination that "[Sheriff] Griffitt admitted to me that he did see me at the fair"; the defendant did not testify that he told his trial counsel that the sheriff had seen him there.

The only other testimony at the hearing came from the state's witness, Dan Dickey, investigator for the public defender's office, and son of sheriff's department sergeant Daniel Dickey, who testified at the trial for the state.[4] Asked if he had talked "to anyone at the Onstotts Tavern" he identified a Don Maggard and a James Montgomery. He did not identify the men as patrons, employees, or operators of the establishment. Neither Maggard nor Montgomery remembered seeing the defendant in Onstotts on the night of the offenses.

Dickey said he obtained the list of the Saturday night arm wrestling contest participants from Fowler and attempted to contact the two persons on the list indicated by the defendant. He contacted Reed who told him he saw the defendant at the arm wrestling contest at "approximately eight o'clock that night for about 20 minutes." Dickey telephoned Carsel's residence "three or four times, went to his house two or three times and was unsuccessful in finding him."

Dickey contacted Tabitha Yardley "to establish the night that [the defendant] had gone to the fair with Fred and Tammy [Forste]." Yardley babysat the Forstes' children the night they attended the fair; Yardley confirmed that it was on a Saturday night. Dickey said he did not remember if he knew when he talked to Yardley that her contact with the defendant had been after midnight.

Dickey said he did not talk to Wise or Sidoti "until the sentencing hearing, I believe." He did not contact Miller, Renfro, or LaGrand. He spoke with Sheriff Griffitt "several times throughout the investigation." Asked if Griffitt was able to verify that he saw the defendant "at the fair earlier that night," Dickey responded, "Yes."

The motion court denied relief and issued findings of fact and conclusions of law in which it stated the defendant had not received ineffective assistance of trial counsel.

---

4. The state had subpoenaed the defendant's trial counsel to testify. Trial counsel was ill and unable to attend the hearing. The state requested a continuance, which the court denied.

*Discussion and Decision*

In points II and III, the defendant challenges the motion court's denial of his Rule 29.15 motion, arguing the court erroneously concluded he did not suffer ineffective assistance of trial counsel. In Point II, he contends his trial lawyer was ineffective in failing to investigate or call as witnesses Wise, Sidoti, Yardley, LaGrand, Reed, and Miller because "testimony by these witnesses would likely have led the jury to credit [the defendant's] version of events over that presented by the state." The defendant argues that because Fred Forste is a convicted felon and the defendant's cousin, the jury likely discounted his testimony and that of his wife Tammy; thus the testimony of Yardley, LaGrand, Reed, and Miller were crucial to corroborate the Forstes' testimony concerning the defendant's whereabouts on August 27, 1988, from around 5:30 p.m. until midnight.

Our review is limited to determining whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(j); *State v. Ervin*, 835 S.W.2d 905, 928 (Mo. banc 1992). The findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made. *Id.* at 928[42].

■ To establish his claims of ineffective assistance of counsel for failing to locate and call witnesses, the defendant had to prove that " 'the witnesses could have been located through reasonable investigation; they would have testified if called; and their testimony would have provided a viable defense.' " *State v. Vinson*, 800 S.W.2d 444, 448–49[10] (Mo. banc 1990) (quoting *Hogshooter v. State*, 681 S.W.2d 20, 21[2] (Mo.App.1984). To demonstrate ineffectiveness in failing to call a witness to testify, a movant must establish that the attorney's failure to call the witness was something other than reasonable trial strat-

egy. A decision not to call a witness is virtually unchallengeable. *Hanes v. State*, 825 S.W.2d 633, 636[6] (Mo.App.1992). If a lawyer believes the testimony of an alibi witness would not unqualifiedly support his client's position, it is a matter of trial strategy not to call him as a witness. *Eldridge v. State*, 592 S.W.2d 738, 741[3] (Mo. banc 1979); *Garrett v. State*, 814 S.W.2d 325, 330[7] (Mo.App.1991). The movant bears the burden of proving ineffective assistance of trial counsel. *Hogshooter*, 681 S.W.2d at 22[5].

■ The defendant argues that trial counsel should have investigated and called as witnesses Wise, Sidoti, and Yardley because they could have testified that he arrived home around midnight and remained there the rest of the night, thereby accounting for the period of time prior to the discovery of the burglary and theft that was not covered by alibi testimony provided by the Forstes.

This argument ignores the fact that much of the state's evidence established that the crimes took place prior to midnight. Ralph Dunlap testified that he and the defendant left Dunlap's residence to commit the crimes when "[i]t was dark, it was late in the afternoon," and that the entire episode lasted "A couple of hours." Coats testified that Dunlap and the defendant left Dunlap's "before dark ... maybe an hour or so" and returned "after dark." The testimony that the defendant claims Wise, Sidoti, and Yardley could have provided would not have contradicted Dunlap's and Coats's testimony concerning the defendant's whereabouts when the crimes apparently were committed. The testimony of the trio would not have provided a viable defense. *See Vinson*, 800 S.W.2d at 448–49[10]; *Hogshooter*, 681 S.W.2d at 21[2]. Thus trial counsel's failure to investigate Wise and Sidoti and his failure to call Yardley as a witness did not constitute ineffective assistance of counsel.[5]

---

5. Trial counsel might have had another reason for not calling Sidoti to testify. The defendant testified at the August 1990 hearing:

> One of the problems with one of the witnesses, which was Gina Sidoti, was her mom is

> Kathryn Coats, the one that testified against me. Now, she was a juvenile and there was a lot of controversy about her getting on the stand. Joe [defense counsel at trial] didn't want her to.

■ Trial counsel's investigator interviewed arm wrestler Reed, but counsel chose not to call him to testify. Assuming the jury would have believed Reed—that he had seen the defendant around 8:00 p.m. for about 20 minutes—his testimony would not have covered the nearly four-hour period from shortly after 8:00 p.m. until midnight or shortly thereafter, ample time for the defendant to have joined Dunlap in an activity that Dunlap said required "a couple of hours." Reed's testimony would not have lent unqualified support to the defendant's alibi; thus a decision to not call Reed to testify could be viewed as trial strategy. *See Eldridge*, 592 S.W.2d at 741[3]; *Garrett*, 814 S.W.2d at 330[7]. Counsel's decision is virtually unchallengeable. *See Hanes*, 825 S.W.2d at 636[6]. Miller's testimony (if he would have testified) would have been of no more help to the defendant than Reed's would have been.

■ Concerning Carsel, investigator Dickey testified about his efforts to contact him. Counsel's failure to interview a potential witness who cannot be located through reasonable efforts is not ineffective assistance. *State v. Tubbs*, 806 S.W.2d 746, 749[7] (Mo.App.1991).

■ The defendant did not advise his trial counsel of Renfro until the date of trial. Failure to interview her is not ineffective assistance. *Burton v. State*, 817 S.W.2d 928, 929–30[2] (Mo.App.1991).

■ At the August 1990 hearing, the defendant said he asked his trial counsel to investigate a "Rhonda LaGrand." In his brief on appeal, the defendant advises that "Ron LaGrand is incorrectly identified throughout the record as 'Rhonda' LaGrand. LaGrand is, in fact, a man. LaGrand's gender is irrelevant for purposes of this appeal. However, this brief will refer to him by his correct name." When a defendant advises his lawyer of a potential witness, that witness's gender is, indeed, relevant. Trial counsel, having been advised to investigate a Rhonda LaGrand, cannot be faulted for failing to investigate a Ron LaGrand.

■ Moreover, the defendant points to no evidence tending to establish that anyone named LaGrand would testify that she—or he—saw the defendant at Onstotts at a time that would aid in his defense. The defendant simply said he told counsel that LaGrand was at Onstotts when he was there. The defendant does not establish that LaGrand would provide a viable defense. *See Vinson*, 800 S.W.2d at 448–49[10]; *Hogshooter*, 681 S.W.2d at 21[2] and 22[5].

We note that, although the defendant testified that he gave the name of Rhonda (or Ron) LaGrand to his lawyer on December 14, 1989, he failed to include the name on the written list of witnesses that his lawyer requested on that date. The motion court was not required to believe the defendant's uncontradicted testimony that he advised counsel about LaGrand. *See Childress v. State*, 778 S.W.2d 3, 5[1] (Mo.App. 1989); *Richardson v. State*, 719 S.W.2d 912, 915 (Mo.App.1986).

After a thorough review of the record, we do not have a definite and firm impression that a mistake was made by the motion court in denying the defendant's request for postconviction relief. The motion court's conclusions are not clearly erroneous. Point II is denied.[6]

A possible explanation of the "controversy" can be gleaned from the cross-examination testimony of Coats in which she stated that when she was arrested in California in late 1988 or early 1989 and returned to Missouri, she left her 16–year–old daughter Gina Sidoti in the defendant's custody. Under questioning by defense counsel, Coats expressed her belief that the defendant had poisoned Sidoti's mind against her, and she said she wanted him to go to prison "to pay for what he did." It would have been reasonable trial strategy for defense counsel to have not risked weakening the effect of his cross-examination of Coats by placing Sidoti on the witness stand.

**6.** The defendant places strong reliance on *State v. Griffin*, 810 S.W.2d 956 (Mo.App.1991), and *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir.), *cert. denied sub nom. Delo v. Kenley*, —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). We find neither helpful to him.

In *Griffin*, the court concluded the defendant received ineffective assistance of counsel where his attorney did not investigate two purported eye witnesses to the offense. The court stated,

In Point III the defendant charges that the motion court "plainly erred" in denying postconviction relief because trial counsel failed to cross-examine Sheriff Griffitt at trial about whether he had seen the defendant at the Barton County Fair on the night of the offenses and because counsel failed to exclude his investigator Dan Dickey from the defendant's case because of an alleged conflict of interest resulting from the son-father relationship between the investigator and Daniel Dickey, the deputy sheriff who investigated the crimes and testified at trial. The defendant concedes that neither his pro se Rule 29.15 motion nor his amended motion "asserted the specific allegations of ineffective assistance of counsel made in this Point III." Nevertheless, the defendant urges that we review his Point III claims for plain error that resulted in manifest injustice.

In *Ervin*, our supreme court made clear that Missouri appellate courts will review only allegations of ineffective assistance of counsel "properly raised in the original *pro se* motion or in the amended motion." 835 S.W.2d at 929[52]. Based on *Ervin*, we expressly refuse to review the defendant's claims of ineffective trial counsel as asserted in Point III.

### ISSUE ON APPEAL:

### ABANDONMENT BY POSTCONVICTION COUNSEL

*Facts*

*November 1991 Hearing Testimony*

Following remand in the defendant's original appeal, the motion court conducted an evidentiary hearing at which postconviction counsel and the defendant testified. We first summarize the testimony of postconviction counsel. On May 1, 1990, counsel sent to the defendant a form letter, which stated in part:

Although our office will conduct its own investigation.... we must rely to a large degree on your perceptions and recollections of what may have gone wrong at [the time of trial]....

Our office does not have funds for attorneys to travel to the various state correctional centers to discuss cases. We must rely upon written correspondence. Very occasionally, we may communicate by telephone....

Once the hearing date is set, it is my practice to arrange to have you brought to the local jail about one week in advance of the hearing so that we may consult together....

The most important thing you can do is suggest witnesses or other sources of proof of your allegations. As you can imagine, your testimony against your attorneys will seldom obtain relief on your motion. I will use the intervening time to research the legal issues relevant to your motion, to contact and interview your witnesses and otherwise get prepared for your hearing. In the meantime, please let me know if you can remember any additional witnesses or any other information that you believe would be helpful to your case.

On May 9, counsel received from the defendant a letter dated May 3, apparently written before the defendant received counsel's May 1 letter. In the May 3 letter, the defendant inquired about the status of a pending "stealing charge on some tires and wheels." The letter provided no information concerning the Rule 29.15 motion other than to state the defendant's desire to testify in support of the motion.

Counsel spoke with defendant by telephone and explained to him "that I needed

---

"Without the [witnesses] the defendant had no defense; with them he had a complete defense if they were believed." 810 S.W.2d at 958. Without LaGrand and Renfro, the various alibi witnesses identified by the defendant would not have provided him a complete defense. We have already explained our conclusion that the failure to investigate LaGrand and Renfro was not ineffective assistance.

In *Kenley*, the court stated, "We will not fault a reasonable strategy not to investigate further if it is based on sound assumptions." 937 F.2d at 1308. It was reasonable for trial counsel to not investigate all potential alibi witnesses who could not assist the defendant with testimony about his whereabouts at the time the Forstes said he was at Onstotts tavern.

the names and addresses of the witnesses that he wanted for the hearing." During that telephone conversation, counsel received from the defendant the name of Tabitha Yardley. On June 13, 1990, counsel received a second letter, dated June 11, in which the defendant provided four names: Deana Wise, Fred and Tammy Forste, and a Glendy Lawson. The letter supplied a rural postal route and box number and a telephone number for Wise, and it advised counsel that the Forstes lived in Golden City. In the letter the defendant stated that Gina Sidoti was now "afraid to testify for me," and he advised counsel, "In order for me to point out the facts to you to where you will understand, we need to talk in person or over the phone." The defendant did not suggest additional facts or grounds to support his postconviction relief motion.

Postconviction counsel said that he investigated the defendant's case by speaking with trial counsel and investigator Dickey and by having his investigator contact—or attempt to contact—Yardley. Counsel did not contact the persons named by the defendant in his May 11 letter. Counsel stated his belief "there was an attempt made to contact them before the amended motion was to be filed." Counsel did not know whether the attempt—apparently conducted by his investigator—to contact the witnesses was successful.

Postconviction counsel filed an unverified amended motion on June 15, 1990, the final day it could be timely filed. In the amended motion, counsel reiterated the claim in the pro se motion about trial counsel's performance; named Yardley as a witness "who would have corroborated alibi testimony and would have provided [the defendant] a defense"; and stated that the defendant would support his allegations with the record, his testimony, and the testimony of his trial attorney and Yardley.

Postconviction counsel said he did not obtain the defendant's verification of the amended motion because "we received information from Mr. Boyd two days before the amended motion was filed.... My feeling is that it would have been impossible to prepare the amended motion in the form in which it was filed, get it to Mr. Boyd, have an independent affidavit signed by him, and get it filed timely." Postconviction counsel said he believed that in June 1990 the law concerning the verification requirement was unclear.

Asked if the hearing was conducted any differently because it was proceeding on the pro se motion rather than on the unverified amended motion, counsel replied, "No." Counsel said that had he gone to the penitentiary and obtained the defendant's verification of the amended motion, it would have made no difference in the evidence that he would have presented or the issues he would have raised at the August 1990 hearing.

Counsel said he did not learn until the day of the August 1990 hearing of the defendant's claim of ineffective assistance of trial counsel arising out of the fact that Sheriff Griffitt saw the defendant at the Barton County Fair on the night of the burglary and theft. Likewise, the hearing day was the first date he learned the names of potential witnesses Renfro, LaGrand, Reed, and Carsel. Counsel did not find Miller's name in his notes from the August 1990 hearing.

Finally, counsel testified that before he filed the amended motion, he was aware of the son-father relationship between trial counsel's investigator Dan Dickey and deputy sheriff Daniel Dickey, who investigated the crimes and testified for the state. Counsel did not amend the Rule 29.15 motion to include an allegation of a conflict of interest because, during his discussions with trial counsel, the investigator, and the defendant, "it was never raised as an issue."

Postconviction counsel said that, contrary to the statement in his May 1 letter, he did not have the defendant transported to the local jail about one week prior to the hearing. He met the defendant face-to-face for the first time on the day of the hearing.

The defendant also testified at the hearing. He said he never spoke to postconviction counsel by telephone and the first time

he talked to him was the day of the August 1990 hearing. The defendant acknowledged he had not informed postconviction counsel about many of the alibi witnesses he identified at the hearing because "I had been trying to get a hold of the man; I could not get a hold of him; he did not respond to my letters. I urged him in one of those letters to contact me."

The defendant said he waited until June 11 to respond to postconviction counsel's May 1 letter because, "I never got a response back to the letter that I had written him the first time [the defendant's May 3 letter]."

The motion court denied relief to the defendant and issued extensive findings of fact and conclusions of law. The findings concerning the allegations of abandonment were consistent with the testimony of postconviction counsel. The court described the defendant's failure to provide a response to postconviction counsel's May 1 letter until two days prior to the due date of the amended motion as "neglect," and the court concluded that postconviction counsel did not abandon the defendant.

### Discussion and Decision

In Point IV the defendant charges that the motion court erred in finding no abandonment by his postconviction counsel because "postconviction counsel failed to fulfill his duties under Rule 29.15(e) and rendered ineffective assistance of postconviction counsel" in five particulars, denominated sub-points A through E. In sub-point A, the defendant charges that postconviction counsel, "Failed to file a verified amended motion on [the defendant's] behalf."

In deciding that sub-point A has no merit, we need not determine whether the motion court was clearly erroneous in its conclusion that it was the defendant's neglect that led to the filing of the unverified amended motion. Postconviction counsel testified—and the motion court found—that the evidence presented and the issues raised at the August 1990 hearing were the same as they would have been had the hearing been conducted on the amended motion. Thus the defendant suffered no prejudice. *See Pollard v. State*, 807 S.W.2d 498, 502[7] (Mo. banc), *cert. denied*, —— U.S. ——, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991); *Whaley v. State*, 833 S.W.2d 441, 444[5] (Mo.App.1992); *State v. Garrett*, 829 S.W.2d 622, 628[14] (Mo.App. 1992).

Sub-points B through E are allegations of ineffective assistance of postconviction counsel. Whatever the quality of postconviction counsel's performance, the defendant's allegations are not cognizable under Rule 29.15, *Pollard*, 807 S.W.2d at 502[6], and are "categorically unreviewable." *Ervin*, 835 S.W.2d at 928–29[48]. Point IV is rejected.

We affirm the judgment of conviction in case No. 17321 and the order denying postconviction relief in case No. 17927.

PARRISH, C.J., and CROW, P.J., concur.