**STATE of Missouri, Respondent,**

v.

**Barry E. BROWN, Appellant.**

**Nos. WD 51367, WD 53611.**

Missouri Court of Appeals,
Western District.

March 24, 1998.

Susan L. Hogan, Appellate Defender, Kansas City, for Appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for Respondent.

HANNA, Judge.

The defendant, Barry E. Brown, appeals from jury convictions for two counts of murder in the first degree, § 565.020.2, RSMo 1994, and two counts of armed criminal action, § 571.015.1, RSMo 1994. The court imposed consecutive life sentences without the possibility of probation or parole. On appeal, the defendant challenges the trial court's ruling regarding two *Batson* [1] based objections—one made by the defendant and one made by the prosecutor. The defendant also appeals from a denial by the motion court, without an evidentiary hearing, of his Rule 29.15 post-conviction motion claiming ineffective assistance of counsel.

In July of 1994, Helen Harmon lived with her four-year-old daughter, Liberty, in the Homestead Apartments at 811 E. Armour Boulevard in Kansas City. The defendant lived, on and off, for several months with Ms. Harmon and her daughter.

In the afternoon of July 5, 1994, the defendant stated to Ms. Loretta Walker that he was going to Ms. Harmon's apartment to take a shower. He later reported that when he opened the door to Ms. Harmon's apartment, he found Liberty lying on the couch and Ms. Harmon lying on the bedroom floor. Both were dead. He ran back to Ms. Walker's apartment and called the police.

The medical examiner estimated that the two victims had been dead for at least 36 hours by the time the bodies were discover-

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

ed. An autopsy revealed that Ms. Harmon had been stabbed 42 times and that Liberty had been strangled and possibly suffocated. Liberty had head hairs on her stomach and her legs that were consistent with the defendant's head hairs.

When questioned by the police, the defendant admitted that he was a good friend of Ms. Harmon and her boyfriend. He stated that he last saw Ms. Harmon alive on the evening of July 2 nd. He also admitted that he had pawned Ms. Harmon's television and videocassette recorder in order to obtain money for crack cocaine and had convinced Ms. Harmon to give him $40 so that he could get her television back. When the police examined Ms. Harmon's apartment, there was a television set in the bedroom but no videocassette recorder.

Two weeks after discovery of the bodies, George Cooper, a friend of the defendant's, told the police that the defendant had admitted that he had killed Helen and Liberty Harmon. The defendant told Cooper that Ms. Harmon had been screaming at him while he was trying to get money from her. He said that he just snapped and stabbed her. He threw the knife in a storm drain. He also admitted killing Liberty because he did not want to leave a witness.

A week later, Patrick Penn, another friend of the defendant, told the police that the defendant had told him that he had killed Ms. Harmon and her daughter. Penn told the police that the defendant came to his house on July 4 th while he was having a barbecue. The two of them walked to a dumpster on Armour Boulevard and the defendant climbed in and produced a knife wrapped in a white plastic trash bag. The defendant admitted using the knife to stab Ms. Harmon. The defendant then disposed of the knife by throwing it down a storm sewer at the intersection of Armour Boulevard and Kenwood.

The defendant explained to Penn that Ms. Harmon had given him some money so that he could retrieve her videocassette recorder. Instead, the defendant spent the money on crack cocaine. He went back to Ms. Harmon's apartment around 3:30 A.M. on July 4 th to get some more money. While the defendant was crawling around on the floor beside Ms. Harmon's bed, she awoke and a fight ensued. The defendant went to the kitchen and got a knife and repeatedly stabbed Ms. Harmon. After he had killed her, the defendant realized he couldn't leave any witnesses so he went to the living room couch and suffocated Liberty. He then put a sock on each of his hands and tried to wipe down the apartment to eliminate any fingerprints.

Police later lifted a latent fingerprint from the refrigerator door which matched the defendant's prints. They also found a six-inch-long wooden handled knife in a storm sewer at the corner of Armour Boulevard and Kenwood. The knife had a broken tip. An x-ray of Ms. Harmon's body disclosed a foreign object consistent with a broken tip of the knife.

At trial, the defendant denied any role in the murders although he admitted taking the television and videocassette recorder which he had pawned to buy crack cocaine. He denied telling Penn or Cooper that he killed Ms. Harmon and Liberty. He did admit seeing Penn on the 4 th of July. The defendant said he went over to Penn's house for a 4 th of July picnic at around 11:30 A.M. and stayed until about 2:30 P.M.

On his direct appeal, the defendant raises two points regarding the court's *Batson* rulings. First, he complains that the trial court abused its discretion in overruling his gender-based *Batson* objection to the state's use of a peremptory challenge to exclude a white female venireperson.

Ms. Olga Rice, a white female, stated during *voir dire* examination that her two sons had been practicing attorneys, and that neither of them practiced criminal law but had discussed the principles of criminal law over the dining room table. She was asked by the prosecuting attorney if she could possibly "exclude these conversations from [her] mind if [she was] selected as a juror." Her answer was "Well, in fact, it helps me." The state initially sought to have Ms. Rice struck for cause based on her "it helps me" response. The motion was denied.

The state peremptorily struck Ms. Rice. The attorney for the defendant objected and

indicated that the state was impermissibly removing Ms. Rice from the jury based on her gender. The assistant prosecutor's explanation for striking Ms. Rice was that "she felt more qualified [to be a juror] based on her two attorney sons." The trial court overruled the defendant's objection. The defendant now contends that he had a right to have a female juror on the jury who was a white female, however, he has not made an argument that the state's reason for excluding Ms. Rice was pretextual.

■ The equal protection clause prohibits both the state and the defendant in criminal cases from using a peremptory challenge so as to discriminate on the basis of race or gender. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

■ In order to proceed with a *Batson* based objection, a party must challenge the peremptory strike in a timely manner on the grounds that the party has engaged in race or gender discrimination in connection with the use of its strike. *State v. Parker*, 836 S.W.2d 930, 939–40 (Mo. banc 1992). The party making the strike is then obligated to give a valid race or gender-neutral explanation for the strike, regardless of whether there exists a *prima facie* case of such discrimination. *See id.; State v. Gray*, 887 S.W.2d 369, 384 (Mo. banc 1994). At this point, the explanation need only be facially race or gender-neutral, and unless a discriminatory intent is inherent in the explanation, the explanation will be deemed race or gender-neutral, even if they are not persuasive or even plausible. *Purkett v. Elem*, 514 U.S. 765, 767–69, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 835 (1995).

■ "In determining whether a defendant has carried the burden of proving purposeful discrimination, the trial court should view the plausibility of the state's explanations in light of the totality of the circumstances of the case." *State v. Daniels*, 865 S.W.2d 400, 402 (Mo.App.1993) (citations omitted). However, "the ultimate burden of persuasion regarding the racial or gender motivation exists with, and never shifts from, the opponent of the strike." *See Purkett*, 514 U.S. at 767–69, 115 S.Ct. at 1771 (citations omitted). Trial courts are "vested with considerable discretion in determining the plausibility of the prosecutor's reasons and whether the prosecutor purposely discriminated in exercising peremptory strikes." *Gray*, 887 S.W.2d at 384 (citations omitted). The trial court's decision will not be overturned unless it appears to be "clearly erroneous." *Id.*

■ In this case, the prosecutor's explanation for striking Ms. Rice was her belief, as interpreted by the prosecutor, that she was more qualified than the average juror because she had two sons who were lawyers. The prosecutor interpreted her response to mean she believed she had more knowledge of the law than the other jurors, thus, other jurors may have deferred to her position during the jury deliberations. The prosecutor's explanation was a facially legitimate, gender-neutral reason for excluding Ms. Rice. The trial court found the explanation to be credible. The defendant has failed to demonstrate that the state's explanation was pretextual and therefore, the trial court's ruling was not clearly erroneous. Point denied.

In his second point, the defendant claims that the trial court erred in sustaining the state's reverse-*Batson* challenge to the defendant's use of a peremptory challenge to remove Mark Lehnhoff from the jury panel. The defendant contends that the state failed to prove that the challenged venireperson was a member of a cognizable racial group. *See Parker*, 836 S.W.2d at 939.

Mr. Lehnhoff was peremptorily challenged by the defendant. The prosecution objected. In the discussion that followed, defense counsel explained that he struck Lehnhoff because he had experience as a paramedic, and that the medical evidence about the cause and time of death would be important matters for the jury's consideration. The court questioned whether that would make any difference. The defendant's attorney responded that it "would make a large difference" since the parties would be "speculating about the time of death." Defendant's counsel admitted, however, that he was not challenging either the cause of death or the time

of death. The court acknowledged the defendant's argument that paramedics have extensive training and are often on the scene when people are dying, but questioned "what difference does that make?" The defendant's attorney simply answered that he wanted to remove Lehnhoff "out of an abundance of caution" because he didn't "want him to bring any of that experience and applying it into speculation or otherwise or actual application in the jury room." The judge denied the defendant's use of a peremptory challenge to strike Lehnhoff.

█ The defendant claims on appeal that the state failed to prove that Mr. Lehnhoff was a member of a cognizable racial group, in this case, a white male. Although it appears that Lehnhoff's race was not specified for the record, the fact that the challenge was a reverse *Batson* objection indicates that the challenge was leveled at striking him for an improper racial or gender motive. On the record, the assistant prosecutor asked the defense counsel for a "race-neutral reason" for his use of a peremptory strike. Hence it is clear that the venire member was not challenged because of his gender. Furthermore, the record indicates that the trial court believed that the defendant's attempt to peremptorily strike Lehnhoff from the jury was impermissibly based on his race. It is clear from the trial record before us that both of the trial attorneys and the trial court understood that the venire member was a white male, a member of a cognizable group. *See State v. West*, 866 S.W.2d 150, 152 (Mo.App. 1993).

█ "A reviewing court will set aside the trial court's findings as to whether the prosecutor discriminated in the exercise of his peremptory challenges only if such finding is clearly erroneous." *State v. Weaver*, 912 S.W.2d 499, 509 (Mo. banc 1995)(citing *State v. Blankenship*, 830 S.W.2d 1, 15 (Mo. banc.1992)). "The trial court's determination of whether a peremptory strike was exercised on racially neutral grounds is entitled to great deference on appeal." *Gray*, 887 S.W.2d at 385 (citations omitted). The trial court's determination will be "clearly erroneous" only if the reviewing court is left with the definite and firm conviction that a mis-

take has been made. *Id. Batson* objections may be made by the state regarding the defendant's racially-motivated use of peremptory strikes to remove white venirepersons from the jury panel. *See West*, 866 S.W.2d at 152. In this case, the trial court did not accept counsel's explanation, and was entitled to conclude that the explanation was pretextual for removing the white venireman. The ruling was not clearly erroneous. Point denied.

Finally, with regard to his Rule 29.15 motion for post-conviction relief, the defendant claims that his attorney was ineffective in not calling three potential alibi witnesses. He claims that if his attorney had called his brother, Timmie Brown, he would have established that he was at his brother's apartment "all day on July 4, 1994," and such evidence would have provided the defendant with an alibi defense to the murders. The defendant told his trial attorney that Janet and Amy Fisher would corroborate Timmie Brown's testimony. The motion court denied the motion without an evidentiary hearing.

█ Appellate review of a motion court's determination, pursuant to Rule 29.15(j), V.A.M.R., is limited to reviewing "whether the findings and conclusions of the motion court are clearly erroneous" by leaving the appellate court with the "firm and definite impression that a mistake has been made." *State v. Schaal*, 806 S.W.2d 659, 667 (Mo. banc 1991) (citations omitted). In order to obtain an evidentiary hearing for an allegation of failure to call witnesses, the defendant must allege that "their testimony would have provided a viable defense." *State v. Wade*, 926 S.W.2d 43, 46 (Mo.App.1996)(citing *State v. Daugherty*, 906 S.W.2d 812, 818 (Mo.App.1995)).

The motion court found that the evidence of the time of death of the two victims was in the early morning hours (approximately 3:30 A.M.) on July 4, 1994, and that Timmie Brown told the police that the defendant was at his apartment "all day on July 4[th]." The motion court concluded that Timmie Brown's testimony did not account for the movant's whereabouts at the time the murders were committed, since his evidence would have

only covered the time period for the following day. Furthermore, Timmie Brown's testimony would have contradicted the defendant's testimony at trial, as observed by the motion court, in which the defendant testified that he went to Penn's house shortly before noon on the 4 th of July.

Counsel will not be found to have been ineffective in failing to call alibi witnesses who would not have supported the alibi in that their testimony would only have supported the defendant's whereabouts *after* the time of the killing. The witnesses would not have supported the defendant's trial theory that he wasn't at the scene of the crime at the time the crime was committed. The result is that the testimony of the witnesses would "not have provided a viable defense" and, therefore, the defendant's trial counsel's failure to call them does not "constitute ineffective assistance of counsel." *State v. Boyd,* 842 S.W.2d 899, 905 (Mo.App.1992). An evidentiary hearing was not necessary because it is clear from the pleadings that trial counsel was not ineffective by not calling the three witnesses. The motion court's findings of fact and conclusions of law are not clearly erroneous. Point denied.

The judgment of convictions and denial of the Rule 29.15 are affirmed.

LOWENSTEIN, P.J., and
BRECKENRIDGE, J., concur.