STATE of Missouri, Plaintiff–
Respondent,

v.

Michael S. DAVIS, Defendant–Appellant.

No. 18941.

Missouri Court of Appeals,
Southern District,
Division One.

June 7, 1994.

Gary E. Brotherton, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

PARRISH, Chief Judge.

Michael S. Davis (defendant) was found guilty, following a jury trial, of first degree murder. § 565.020.1.[1] The jury was unable to agree upon punishment. The trial court sentenced defendant to imprisonment for life without eligibility for parole. § 565.020.2. This court affirms.

All evidence that tends to prove defendant's guilt and all inferences that support the verdict of the jury are accepted as true. *State v. Barber*, 635 S.W.2d 342, 343 (Mo.1982). Contrary evidence is disregarded. *State v. Brooks*, 618 S.W.2d 22, 23 (Mo. banc 1981).

On Friday evening, November 8, 1991, defendant and Billy Van Troba met in Cape Girardeau. They got into Van Troba's truck and drove around Cape Girardeau. They traveled to Jackson and Scott City and re-

---

1. References to statutes are to RSMo Supp.1991, unless stated otherwise.

turned to Cape Girardeau about 9:00 or 10:00 p.m. where they switched vehicles. They rode for a while in defendant's automobile then went to B.G.'s, an area restaurant. Defendant and Van Troba consumed a 12–pack of beer prior to going to the restaurant. They arrived at B.G.'s about 11:00 p.m. While there, they drank a pitcher of beer and ate an order of potato skins.

Defendant and Van Troba left B.G.'s between 11:45 p.m. and midnight. They rode around some more in defendant's automobile. During the course of their travels, defendant drove to his parents' home. Defendant drove his automobile into the driveway, told Van Troba to wait, and went into the house. Defendant returned a short time later with a knife. Van Troba described the knife as "a boot knife." He explained, "It had about a six-inch blade, double-edged, black handle."

Defendant drove to Scott City then back to Cape Girardeau. Van Troba fell asleep in the car. He awakened about 2:30 or 3:00 a.m. They were entering Scott City. Defendant drove to a house where his sister-in-law, Traci Davis, was living. Traci and her husband, defendant's brother, were separated. Defendant told Van Troba to stay in the car and went inside the house. Van Troba testified, "And then he came back and got me and told me that he told Traci that we were being chased by the police and we could stay there for a while."

Defendant and Van Troba went inside the house. Van Troba laid down on a couch. Traci asked if they wanted blankets. They told her, "[N]o." She went back to bed. Van Troba was asked the following questions and gave the following answers:

Q. [by the prosecuting attorney] What happened, then, after Traci went back into the bedroom?

A. Well, we laid there and really didn't say much. Then he started asking me questions, what I thought about her. And I told him I, you know, thought she was cute. And he said, yeah, I'm planning on getting a piece of that.

. . . . . .

Q. What happened next?

A. Well, I—We just laid there. And the more I thought about it, I wanted to leave. And I told him I wanted to go back to my truck. And he said, well, we drove by it while you was asleep and it was all right.

Q. So what happened next?

A. We laid there some more, and he got up and went to another room and came back with a stick or a club or something.

Q. Can you describe this stick or this club?

A. It was about that long (indicating). Probably six inches—I mean, six foot—No. Three foot.

Q. And how big around, if you can recall?

A. About the size of a broom handle.

Defendant stuck the stick in his sleeve and sat down. He told Van Troba they would leave in a little bit. Defendant gave Van Troba the keys to the car and told him to go start it. Van Troba left the house. He got into the car on the passenger side and turned on the car stereo. He heard a scream. Defendant ran from the house, opened the passenger's side door and told Van Troba to drive. Van Troba explained, "And he started pushing me over to drive, so I got over and started driving and asked him what happened or asked him what the scream was and he said he killed her." Van Troba asked defendant why he killed her. Defendant told Van Troba she had caused problems in his family.

Van Troba drove defendant's automobile to a truck stop about two or three miles from Traci's house. Van Troba got out of the car. As he walked away, defendant asked him not to call the police. Van Troba called his mother from the truck stop and asked her to come get him.

At approximately 4:37 a.m., November 9, 1991, the Scott City Police Department dispatcher received a call from a woman who said she was bleeding. The dispatcher asked the woman her address. She replied, in a faint voice, that her address was 508 Oak Street. Paramedics and police officers were dispatched to that address. They began ar-

riving two or three minutes after the call was received.

When the officers and paramedics arrived, lights were on inside the house. There was blood on the doorknob at the rear of the house. Defendant's knife was lying in grass near the door. The officers and paramedics forced the door open and entered the house. Traci was lying on the floor in the kitchen. The telephone was wrapped around her arm. Traci's daughter, two or three years old, was standing in a doorway between the living room and the master bedroom of the house.

Traci Davis was alive when the officers and paramedics arrived. She was asked who had assaulted her. She said her brother-in-law, Michael Davis, did it.

A helicopter transported Traci to Southeast Missouri Hospital. She died at 6:35 a.m. An autopsy revealed fourteen stab wounds to Traci's body. The pathologist who performed the autopsy gave his opinion of the cause of death as "[e]xtensive hemorrhage or bleeding, secondary to stab wounds."

After Billy Van Troba left defendant at the truck stop where they had driven from Traci's house, defendant drove on Interstate Highway 55 heading to Michigan. He intended to go to his mother-in-law's house in Lansing. He stopped at a rest area along the way and called her. He told her he needed to talk to her; that he "got into it with Traci and some stuff had happened." Defendant drove back onto the road heading toward Michigan.

Later, defendant called his mother-in-law again. He was in Berrien County, Michigan, the state's southwestern-most county. He called her from a gas station. When she answered her telephone, she was crying. She told defendant that Traci died. Defendant asked what he should do. She told him to go to the police.

Defendant saw a police officer at the gas station. He told the officer what happened and that he wanted to turn himself in and "get things taken care of." The officer arrested defendant and took him to the Berrien County Sheriff's Department in St. Joseph, Michigan. Defendant gave a statement that was videotaped. The statement was given the date of arrest, November 9, 1991. It was admitted in evidence at trial.

■ Defendant's first point on appeal is directed to a second videotaped statement the state did not offer in evidence. After the state rested its case, defendant's trial counsel told the trial court that defendant intended to offer into evidence a second statement that defendant gave Michigan police officers. The attorney announced:

> The defense is intending to call [Michigan Deputy Sheriff] Tom Beardslee to the stand in regards to a November 15th statement that was videotaped. And part of it was done in written form also of Michael Davis when he was still in Michigan.

The prosecuting attorney objected to the proposed testimony of Deputy Sheriff Beardslee on the basis "that a defendant may not offer a self-serving statement as substantive evidence." The trial judge stated, "I'm persuaded at this point that would be improper and not offered for any relevant purpose at this time, unless you have some authority to permit it." Defendant's trial counsel stated, "Not at this time, Judge."

Defendant, in his first point on appeal, characterizes the state's objection to the second videotaped statement as a motion in limine and asserts the trial court erred in sustaining the motion. Defendant contends "that the state injected the issue of [defendant's] demeanor during the first videotaped statement as proof of [defendant's] guilt, thus making his demeanor during the second videotaped statement necessary to rebut the state's case."

Defendant points to testimony by the Michigan officer who interrogated defendant in the videotaped statement that was admitted in evidence, and to certain statements the prosecuting attorney made to the jury in closing argument. The officer was asked if he heard defendant say "I'm sorry." The officer answered, "Not that I can recall." The officer was asked, "Did you ever see a tear or anything indicating any emotion or remorse during this interview?" He answered, "No, sir. In fact, upon my professional experience in this, I thought it was very—"; whereupon an objection was posed.

The witness continued, "—unusual to see that." He concluded, "He was completely—very calm, cool during the entire interview, very matter-of-factly presenting the statement to me."

During closing argument the prosecuting attorney compared defendant's demeanor during the videotaped statement that was admitted in evidence with defendant's demeanor during his testimony at trial. The prosecuting attorney suggested to the jury that defendant showed remorse during his testimony at trial because he had been "prepared for this performance," but that the videotaped statement showed no remorse.

The record on appeal does not reflect that any videotape, other than the recording of the November 9 statement, was marked as an exhibit. Neither does it include testimony of Deputy Sheriff Beardslee. No videotape was filed with this court. Exhibits not filed may be considered as immaterial to the issues on appeal. *See* Rule 30.05.

Notwithstanding procedural failings, this court has gratuitously reviewed defendant's claim that he should have been permitted to present to the jury the videotaped recording of his November 15, 1991, statement. Defendant bases his claim of trial court error on the rule stated in *State v. Hamilton,* 310 S.W.2d 906, 908 (Mo.1958), and *State v. Campbell,* 533 S.W.2d 671, 675 (Mo.App. 1976), that a defendant may introduce evidence to explain other evidence previously introduced by the state that incriminates the defendant or to show that an inference that could otherwise be drawn from the state's evidence is unwarranted. Defendant argues that since the state contended the videotape the jury saw showed him to be unremorseful, he was entitled to show the second videotape, made six days later, that he contends demonstrated remorse.

The circumstances in *Hamilton* and *Campbell* differ from those in this case. In *Hamilton* and in *Campbell* a defendant explained why he committed incriminatory acts. In *Hamilton* the defendant explained why he

registered in a hotel under a fictitious name. In *Campbell* the defendant explained why he fought with police officers when they arrested him; that it was not an attempt to escape.

■ In this case, defendant did not attempt to show the second videotaped statement to explain acts he committed. The second videotaped statement was a recording of a declaration defendant made six days after he was arrested. The statement was not part of a continuous occurrence intimately connected with the act of killing Traci Davis. As such it was not part of the res gestae.[2] *See State v. Bell,* 359 Mo. 785, 223 S.W.2d 469, 471 (banc 1949). A defendant is not entitled to introduce as evidence a self-serving declaration that is independent of the res gestae of the crime. *State v. Sweet,* 796 S.W.2d 607, 614 (Mo. banc 1990). Defendant's first point is denied.

■ Defendant's second point alleges the trial court committed plain error "in failing, *sua sponte,* to declare a mistrial during the prosecutor's rebuttal argument, because the prosecutor ... engaged in a bad faith argument that [defendant's] demeanor on the witness stand merely showed that he had been well prepared, despite the prosecutor's knowledge that [defendant] showed emotion during his second videotaped statement and despite that it was the prosecutor's objection which prevented the jury from seeing the second videotaped statement." The part of the state's final argument about which defendant complains is the statement:

> You've seen, ladies and gentlemen, you have seen with your own eyes, two different defendants. You've seen the Defendant that took the stand today that has been prepared for this performance, and you saw with your own eyes yesterday the Defendant, hours after Traci Davis was murdered.

Defendant contends the prosecutor's statement was improper; that "[t]he trial court gave its imprimatur to this improper and prejudicial argument by failing *sua sponte* to

---

**2.** "Acts or events are a part of the res gestae if they occur in the same transaction as the crime, are substantially contemporaneous with the commission of the crime and are part of one continuous transaction in the accomplishment of a common design." *State v. Winston,* 657 S.W.2d 399, 401 (Mo.App.1983).

**674**

declare a mistrial. . . ." This court does not agree.

First, as stated in the part of this opinion disposing of defendant's first point, this court was not provided with the "second videotaped statement." As such, its content is unknown. Second, as determined in addressing Point I, the trial court's denial of defendant's request to show the "second videotaped statement" was not error. Third, the jury was properly instructed that it alone was to decide upon the believability of witnesses and the weight and value of the evidence; that it could "take into consideration the witness' manner while testifying; . . . any interest, bias, or prejudice the witness [might] have; . . . ." MAI–CR3d 302–01. The jury was further instructed, "[The attorneys'] arguments are intended to help you in understanding the evidence and applying the law, but they are not evidence." MAI–CR3d 302.06.

■ Defendant offered himself as a witness, thereby placing his credibility in issue. *State v. Roberts,* 615 S.W.2d 496, 497 (Mo. App.1981). "When a defendant offers himself as a witness in his own behalf his testimony is subject to the same arguments on the issue of his credibility as is any other witness." *State v. Henderson,* 530 S.W.2d 382, 384 (Mo.App.1975).

■ The fact finders—the jury—were entitled to take into account defendant's demeanor as a witness in judging his credibility. *Hampton v. Niehaus,* 329 S.W.2d 794, 802 (Mo.1959). "[T]he 'witness' demeanor, * * * without any definite rules as to its significance, is always assumed to be in evidence." *Id.,* quoting from *Wigmore on Evidence,* Vol. III, § 946, p. 498.[3] The prosecuting attorney was entitled to compare the evidence the jury had before it, defendant's demeanor as a witness and defendant's demeanor in the videotaped statement admitted in evidence. The argument was no more than the prosecutor's attempt to explain the evidence before the jury from the perspective of the state's case.

■ Defendant did not preserve Point II for appellate review because he failed to object at trial when the argument was made. *State v. Green,* 674 S.W.2d 615, 622–23 (Mo. App.1984). Nevertheless, this court has reviewed the issue presented pursuant to Rule 30.20 to determine if manifest injustice or miscarriage of justice occurred and finds that it did not. The trial court committed no error, plain or otherwise. Point II is denied.

■ Point III is directed to trial testimony of Billy Van Troba. Defendant contends the trial court erred in permitting Van Troba to testify that defendant stated to him "that [defendant] wanted to stab a woman and have sex with her as she died." Defendant argues that the statement was irrelevant to the offense charged; that any probative value it had was outweighed by its prejudicial effect. Defendant's complaints are directed to the following testimony.

Q. [by the prosecuting attorney] Let me ask you, sir: What sort of topics or subjects did the two of you talk about as you were riding around these several hours?

A. [by Mr. Van Troba] Well, we started talking about a class that he was taking at SEMO.

Q. And what do you recall about that conversation?

[Defendant's attorney]: Your Honor, I'm going to object to this line of questioning as being irrelevant.

THE COURT: Well, we'll go a little further and see if there's any relevance. So the objection will be overruled at this point.

Q. [by the prosecuting attorney] What did he tell you about this particular class that he had?

A. That he was supposed to write a paper on a crime, plan out a crime. And he wrote one about a murder, and he described it to me. I really can't remember all the details how it was, but we talked about that.

* * * * *

3. This language is found in 3A Wigmore, *Evidence* § 946 (Chadbourne rev. 1970).

Q. Let me ask you whether or not there were discussions about young women that the two of you knew?

A. Yes.

Q. Can you tell us what was discussed about girls?

[Defendant's attorney]: Your Honor, I'm going to object to this line of questioning also as being irrelevant.

THE COURT: Overruled.

Q. [by the prosecuting attorney]: You may answer, sir.

A. What was the question again?

Q. Yeah. What did you talk about as far as girls that had been causing anybody any problems?

A. What did we discuss about them?

Q. Yeah. What did you talk about?

A. About just stabbing them and having sex with them.

. . . . .

Q. How did that conversation come up?

A. By the paper that he wrote in class.

Q. What to the best of your recollection were his exact words about that?

A. About stabbing a girl and having sex with them while they were doing— while they were dying.

Q. Was this something that he said in a joking manner?

A. It seemed like it to me. He was laughing about it.

Mr. Van Troba was then asked if any names of girls were mentioned. He answered, "Yes," and stated three names. Traci Davis was not one of them. The prosecuting attorney asked, "And what, if anything, did the Defendant say about any problems they had caused in his life?" Van Troba answered, "Just they had caused problems with his family."

Defendant's argument as to Point III asserts that statements about stabbing a woman and having sex with her as she died "constituted proof of other bad acts for which [defendant] was not standing trial." Defendant correctly states, "[I]t is well established that proof of a separate or distinct crime is inadmissible unless it has a legitimate ten-

dency to clearly establish the defendant's guilt of the crime for which he is on trial, or falls within one of several recognized exceptions to show motive, intent, absence of mistake or accident, a common plan, or identity," citing *State v. Holbert*, 416 S.W.2d 129, 132 (Mo.1967).

Defendant also points to the holding in *State v. Kitson*, 817 S.W.2d 594 (Mo.App. 1991), that evidence of prior misconduct is improper in some instances even though the conduct does not amount to an uncharged crime. He contends, on these bases, that Billy Van Troba's testimony of defendant's prior statements was improper; that the trial court erred in admitting it.

Defendant's reliance on *Holbert* and *Kitson* is misplaced. The facts in this case differ from those upon which *Holbert* and *Kitson* are based. The statements about which defendant complains did not involve commission of other crimes or commission of prior acts. The statements described fantasies that defendant related to Van Troba, not acts that he had committed.

The defendant in *Kitson* was charged with sodomy—committing deviate sexual intercourse with his son. The son was about five years old when the acts allegedly occurred. He was seven years old at the time of the criminal trial. The state presented evidence of sexual conduct between Kitson and his wife that the appellate court found was "a plain, direct and focused attack on [Kitson's] character—a possible 'sodomizer' or 'pervert'; therefore, a bad character who, because of his bad character, must have committed the crime charged." *Id.* at 598.

The court, in *Kitson*, described the state's position to be that the particular sexual conduct between Kitson and his wife "was not a crime because [Kitson] and Mrs. Kitson were husband and wife at the time this alleged misconduct took place; evidence of this noncriminal sexual conduct, therefore, avoid[ed] the rigors of the uncharged misconduct doctrine and [was] admissible." *Id.* at 597. The court held:

Society's standards for character are reflected in a jury, and those standards are not necessarily congruent with the stan-

dards for criminality. We, therefore, do not limit the doctrine of uncharged misconduct evidence to crimes, and we find the evidence of noncriminal sexual conduct here is as inadmissible as that conduct would be if it were criminal conduct.

*Id.* at 598.

This court does not agree with defendant's claim that the circumstances of this case are analogous to those in *Kitson*. *Kitson* involved evidence of acts independent of the crime for which that defendant was on trial. This case does not involve allegations of other acts, criminal or noncriminal. It involves statements defendant made the night Traci Davis was murdered. As such, it is more akin to *State v. Holt*, 758 S.W.2d 182 (Mo. App.1988), than to *Kitson*.

▆▆ The defendant in *Holt* stabbed the victim to death. There was testimony that he made statements on one of the two nights preceding the stabbing about wanting to get a knife and perform open heart surgery, and on the night of the stabbing he said he would not mind cutting someone's heart out and showing it to the victim before the victim died. On the night of the stabbing, the defendant in *Holt* made other statements to the effect that if someone spoke to him or messed with him he would cut out their heart; "do open-heart surgery"; "hurt 'em." *See* 758 S.W.2d at 185. The court in *Holt* determined that, under all the circumstances of that case, the statements were part of the res gestae of the crime.

Here, prior to Traci Davis' death, defendant expressed a desire to kill three young women who had caused problems for his family and have sexual relations with them while they were dying. Defendant's comments were part of a conversation that included a discussion of a paper he stated he had written for a college class that required him to plan a crime. He stated that the

crime he planned involved having sexual relations with a woman as she was killed.

The night Traci was killed, defendant told Billy Van Troba that she had caused problems for his family. Defendant also made a statement to Van Troba that could be understood to mean that he intended to have sexual relations with Traci. While talking about Traci, defendant told Van Troba, "I'm planning on getting a piece of that." Based on the holding in *Holt*, the statements were admissible as part of the res gestae of the offense "as background information to elucidate a main fact in issue." 758 S.W.2d at 185, quoting *State v. Sherman*, 637 S.W.2d 704, 706 (Mo. banc 1982).

The offense for which defendant was tried and found guilty was murder in the first degree. "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." § 565.020.1. Facts required to be proven in order to convict defendant of that offense were that he knowingly caused Traci Davis' death and that he did so after deliberation, i.e. after "cool reflection for any length of time no matter how brief." § 565.002(3), RSMo 1986. "Deliberation may be inferred from the circumstances surrounding the homicide."[4] *State v. Watson*, 839 S.W.2d 611, 616 (Mo.App.1992).

The fact that defendant discussed killing women who caused problems for his family; that he fantasized about having sexual relations with them as they were killed; that he made a statement that could mean he intended to have sexual relations with Traci Davis; that he stated Traci had caused problems for his family were circumstances surrounding the homicide from which deliberation could be inferred. Those statements provided background information that elucidated main facts in issue, intent and deliberation. Under the holding in *Holt*, the statements were admissible as res gestae of the offense.

---

4. The verdict directing instruction for first degree murder, patterned after MAI–CR3d 313.02, required the jury to find beyond a reasonable doubt that defendant caused Traci Ann Davis' death by stabbing her, "that defendant was

aware that his conduct was practically certain to cause the death of Traci Ann Davis, and … that defendant did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,…."

**677**

█ Apart from res gestae [5] consider-ations, defendant's statements are admissions. Out-of-court statements of a defendant in a criminal case relevant to a material issue are admissions. They are admissible as substantive evidence. *State v. Engleman,* 634 S.W.2d 466, 480 (Mo.1982). Defendant's statements are relevant to material issues of intent and deliberation. Point III is denied.

█ Defendant's Point IV is directed to photographs admitted in evidence. Point IV asserts the trial court erred in admitting "photographs denominated State's Exhibits 126 through 134, autopsy photographs of Traci Davis, ... in that any probative value the photographs may have had to shed light on any material issues was outweighed by their prejudicial effect, as the photographs were cumulative, repetitious, gruesome, and unduly inflammatory."

State's exhibits 126 through 134 were offered and admitted in evidence during the testimony of the pathologist who performed the autopsy, Dr. Gordon Johnson. The photographs show stab wounds on the victim's left and right side (state's exhibits 126 and 127), neck (state's exhibit 128), left hand (state's exhibit 129), chest (state's exhibit 130), exterior right arm (state's exhibit·131), interior right arm (state's exhibit 132), waist and arm (state's exhibit 133) and back (state's exhibit 134). They show the victim lying on a gurney prior to the autopsy.

Dr. Johnson was asked what the photographs depicted. He answered, "These photographs fairly and accurately depict Traci Davis at the time of autopsy at the Jefferson Memorial Hospital Morgue. They show the multiple stab wounds accurately." He was asked if the photographs would assist him in explaining to the jury the severity of the injuries. He answered, "Yes."

Dr. Johnson referred to the photographs in explaining the injuries he observed on the body of Traci Davis. He suggested the type of blade that was required to have produced some of them and the distance the blade was required to travel through the body. He was asked the following questions and gave the following answers:

Q. The wounds other than the one to the back, would those wounds have been fatalistic in and of themselves?

A. The one to the right chest could have been, but usually would not have been. And taken together, the others could have caused enough hemorrhage to cause death in due time.

Q. Excluding, then, that stab wound to the back, if Traci Davis had received medical attention, prompt medical attention, what can you tell us, if you can tell us anything, about her chances of survival?

A. They would have been reasonably good.

Dr. Johnson was then asked to examine defendant's knife that was found in the yard outside Traci's house and whether it "could have consistently caused" the injuries depicted in the photographs. Dr. Johnson answered, "Yes, it could have."

The trial court is afforded broad discretion in determining the admissibility of demonstrative evidence, such as a photograph, and the admission of such evidence is error only upon a showing of an abuse of discretion. *State v. Holtkamp,* 588 S.W.2d 183 (Mo.App.1979); *State v. Mattingly,* 573 S.W.2d 372 (Mo.App.1978); *State v. Love,* 546 S.W.2d 441, 452 (Mo.App.1976). A photograph, generally speaking, is superior to words as a means of description, *State v. Blair,* 531 S.W.2d 755 (Mo.App.1975), and it should not be rejected because by presenting an accurate portrayal it tends to be inflammatory. *State v. Swenson,* 551 S.W.2d 917 (Mo.App.1977); *State v. Clark,* 494 S.W.2d 26 (Mo.1973).

5. This court is mindful of suggestions "that there is no way whereby the scope of the res gestae rule may be defined with precision," and that courts that tend to limit res gestae to spontaneous utterances "would still admit in evidence, on some other basis, a declaration evincing intent, a statement made by the defendant when arrested, or testimony relating to what a police officer or other witness had heard or observed at the scene of the crime." Torcia, *Wharton's Criminal Evidence* § 288, p. 233 (14th ed. 1986). Torcia suggests, "[I]t would seem that res gestae has become a term which means little more than a logical relevance or relationship of the evidence to the crime." *Id.*

*State v. Burnfin,* 606 S.W.2d 629, 630 (Mo. 1980).

A photograph is admissible to depict the nature and location of wounds on a body and the cause of death. *State v. Evans,* 639 S.W.2d 820, 822 (Mo.1982). The trial court did not abuse its discretion in admitting them in evidence. Point IV is denied.

Defendant's Point V is directed to Instruction No. 4 that the trial court read to the jury, the instruction defining reasonable doubt. Instruction No. 4 is patterned after MAI–CR3d 302.04. Defendant contends that it denied him due process of law in that it permitted the jury to find him guilty "based on a degree of proof that was below that required by the due process clause[s] [of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Missouri Constitution]."

As defendant acknowledges in his brief, the argument he now makes as to the correctness of the reasonable doubt definition has consistently been rejected. *See State v. Ervin,* 835 S.W.2d 905, 924 (Mo. banc 1992); *State v. Blankenship,* 830 S.W.2d 1, 13 (Mo. banc 1992); *State v. Griffin,* 848 S.W.2d 464, 469 (Mo. banc 1993). Point V is denied. The judgment and sentence are affirmed.

SHRUM and MONTGOMERY, JJ., concur.