STATE of Missouri, Plaintiff–
Respondent,

v.

Doyle KELLEY, Defendant–Appellant.

Doyle KELLEY, Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

Nos. 19988, 20892.

Missouri Court of Appeals,
Southern District,
Division Two.

July 17, 1997.

Motion for Rehearing or Transfer
Denied Aug. 8, 1997.

Frederick A. Duchardt, Kearney, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David R. Truman, Asst. Atty. Gen., Jefferson City, for Respondent.

SHRUM, Judge.

A jury convicted Doyle Kelley (Defendant) of first degree murder in the death of Diana Kelley and first degree murder in the death of Christy Kelley. For each conviction, the trial court sentenced Defendant to life imprisonment without parole. Defendant brings appeal 19988 from those judgments.

In his direct appeal, Defendant's principal claims of trial court error are in two categories: First, that the trial court committed reversible error when it allowed the State to join the two murder charges and refused to sever the cases, and second, that the trial court erred in several evidentiary rulings. We reverse the judgment stemming from Defendant's conviction for the murder of Christy Kelley and remand that case for further proceedings. We affirm the judgment on Defendant's conviction for the murder of Diana Kelley.

While his direct appeal was pending, Defendant filed a motion to vacate the judgment and sentence per Rule 29.15. The motion court denied relief after an evidentiary hearing. Defendant brings appeal 20892 from that order. In 20892, we affirm the portion of the judgment of the motion court that denies postconviction relief for the murder of Diana Kelley. No. 20892 is moot as to denial of postconviction relief for the murder of Christy Kelley.

We consolidate the appeals pursuant to Rule 29.15(*l* ) but analyze them separately.[1]

### DIRECT APPEAL: NO. 19988

#### FACTS

Defendant does not challenge the sufficiency of the evidence. On the morning of September 26, 1990, the body of Diana Kelley (Diana) was found in her car on a Joplin, Missouri, parking lot.[2] Defendant, who was then Diana's husband, had filed a missing person report concerning Diana before her body was found. Defendant told the police that he and Diana had been separated for about two weeks but had agreed to meet at 9:00 p.m. the night before her body was found. According to Defendant, she did not meet with him as scheduled. Later, Defendant said that he called Diana's mother twice asking for Diana on the night of September 25.

Virginia Stepp (Mrs. Stepp), Diana's mother, confirmed that Defendant called twice on the night of September 25. She also told police that Diana was afraid of Defendant and had been living at Mrs. Stepp's home for

---

1. Defendant was sentenced before January 1, 1996, and his Rule 29.15 motion was filed August 30, 1995; consequently, Defendant's postconviction motion was governed by Rule 29.15 (1995). Rule 29.15(*l* )(1995) mandated consolidation of the two appeals.

2. Without intending any disrespect but solely to maintain clarity, in this opinion we refer to Diana Kelley as "Diana."

two weeks before her death. Mrs. Stepp said she saw Defendant at his home between 6:30 and 6:45 a.m. on September 26.

Dr. James Habermann conducted the initial autopsy of Diana's body. Among other findings, Dr. Habermann noted several small areas of hemorrhage on Diana's face and neck. Dr. Habermann found that Diana died of respiratory failure. However, he could not detect if she died of strangulation.

Debra Stout, a friend of Diana's, testified that Diana visited in Stout's home on the evening before she died. During that visit, which occurred around 5:00 p.m., Stout saw that Diana was wearing a gold chain and a St. Christopher medal.

Two days after Diana's death, Stout was visiting in Defendant's home. While she was there, Defendant took Diana's gold chain and St. Christopher medal to the basement and "smashed it, I believe with a hammer." Stout was asked if Defendant had an explanation about where he had gotten the jewelry. She answered that Defendant said it had been given to him by the police or someone at the mortuary.

Policemen testified that the chain and medal were not at the murder scene when they investigated. Mrs. Stepp testified that she was present when mortuary employees gave Diana's jewelry to Defendant. At the time, Mrs. Stepp selected a ring to put on Diana's hand. She did not, however, see a St. Christopher medal among the items given to Defendant.

During his testimony, Defendant admitted that a few days after Diana's death, he had her St. Christopher medal. He also admitted that he smashed the medal and then threw it away. Defendant claimed that someone at the mortuary had given him this item of jewelry.

In 1991, Defendant was married to Christy Kelley (Christy).[3] In March 1993, Christy and Defendant separated. Defendant and Christy arranged to meet on April 24, 1993, to exchange items of property. Witnesses saw Christy and Defendant on the parking

lot of Christy's apartment during the afternoon of April 24. One witness saw Defendant alone at Christy's apartment building that afternoon.

On the evening of April 25, Christy's family contacted the Joplin police department. They requested that the police check on Christy since she was several hours overdue to pick up her daughter. Joplin police officers forcibly entered Christy's apartment and found her body floating face down in the bathtub.

Dr. Darrell Swank performed an autopsy on Christy's body. Among other findings, Dr. Swank said that Christy had a deep laceration on her forehead caused by blunt force trauma, vomitus in her nose and mouth, and edema in her lungs. Dr. Swank concluded that Christy's death was caused by drowning.

On August 25, 1993, the body of Diana was exhumed. At this time Dr. Jill Gould conducted autopsies of both Diana and Christy. She found the ligament from Diana's hyoid bone had been pulled apart and discovered a bruise on the back of Diana's esophagus. Dr. Gould concluded that Diana's death was caused by soft ligature strangulation. During Dr. Gould's autopsy of Christy's body, she found several bruises in various locations. Dr. Gould suggested that these bruises were caused by blunt impact from multiple directions, which would have been inconsistent with a fall in the bathtub. Dr. Gould confirmed Dr. Swank's finding that drowning was the cause of Christy's death.

While Defendant was in the Jasper County jail awaiting trial, Lonnie Bell (Bell) was also an inmate in that facility. For approximately three days in early June 1994, Bell was in the same area of the jail as Defendant. Bell testified that Defendant admitted killing both Diana and Christy by strangling them.

## DISCUSSION AND DECISION

*Points I, II, and III: Joinder and Severance Issues*

Defendant first contends that joinder of the two first degree murder charges was

---

3. For the reasons mentioned in note 2 and with no disrespect intended, in this opinion we refer to Christy Kelley as "Christy."

improper because § 565.004.1 RSMo, Cum. Supp.1993 that allows joinder of capital cases based on 545.140.2, RSMo (same or similar character rationale) came into effect after both murders had been committed. In spite of established precedent to the contrary, Defendant argues that joinder should be viewed as substantive law and not as a procedural matter. Thus, he asserts that the trial court retroactively applied § 565.004.1 contrary to United States and Missouri constitutional prohibitions against ex post facto criminal laws.

■■■ The federal and state prohibitions against ex post facto laws apply to retrospective enactments that disadvantage a defendant by altering substantial personal rights; yet, these prohibitions do not affect retrospective changes in modes of procedure. *Miller v. Florida,* 482 U.S. 423, 430, 433, 107 S.Ct. 2446, 2451, 2452–53, 96 L.Ed.2d 351 (1987); *State v. Stevens,* 757 S.W.2d 229, 231 (Mo.App.1988). A substantive enactment increases punishment or changes the ultimate facts or elements required to establish guilt. *Miller,* 482 U.S. at 433, 107 S.Ct. at 2452–53; *State v. Hillis,* 748 S.W.2d 694, 697 (Mo.App. 1988). "A procedural law is the 'machinery' for carrying on the suit." *State v. Casaretto,* 818 S.W.2d 313, 316[8] (Mo.App.1991).

In *State v. Baker,* 524 S.W.2d 122 (Mo. banc 1975), the Missouri Supreme Court held that the rule of criminal procedure on joinder, then Rule 24.04, was procedural. *Id.* at 127. In 1977, the Missouri Supreme Court, again, held that the rule regarding joinder was procedural, not substantive. *State v. Duren,* 556 S.W.2d 11, 19 (Mo.banc 1977) *rev'd on other grounds,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). The holding in *Duren* denied an appellant's challenge that joinder was a substantive matter and therefore an improper subject for a Supreme Court Rule under Article V, Section 5 of the Missouri Constitution. *Id.* The Court denied essentially the same constitutional challenges in *State v. Lee,* 556 S.W.2d 25, 29 (Mo.banc 1977) and *State v. Minor,* 556 S.W.2d 35, 38 (Mo.banc 1977).

■■■ While Defendant challenges the retroactivity of a joinder statute and not a Supreme Court Rule, we note that Rule 23.05 and Rule 24.07 address the subject of joinder. Joinder is a procedural matter under the rationale of *Baker, Duren,* and their progeny. Joinder does not increase the punishment nor change the essential facts or elements of a crime. Thus, the retroactive application of § 565.004.1 here does not constitute error. *See State v. Harris,* 705 S.W.2d 544, 547–548, n. 1 (Mo.App.1986). Point I is denied.

Defendant's second point contends that the two murders were improperly joined because the two crimes were not the same or similar in character. He asserts that the space of nearly three years between the murders defeats the reasoning that the two murders were the same crime or similar in character. He also places heavy emphasis upon an argument that the tactics employed in the murders necessarily render the crimes too dissimilar for joinder. We disagree.

■■■ Joinder is either proper or improper. *State v. Langston,* 889 S.W.2d 93, 96[1] (Mo.App.1994). The propriety of joinder is a matter of law. *State v. Jones,* 863 S.W.2d 353, 356–57[4] (Mo.App.1993). A trial court's decision as to whether joinder is proper should be based solely on the State's evidence. *Langston,* 889 S.W.2d at 96[3]. Liberal joinder of offenses is favored in order to achieve judicial economy. *Id.; Jones,* 863 S.W.2d at 356[2].

Defendant's first notion that the length of time between the two murders defeats joinder under a same crime or similar character rationale is unsupported by authority. He argues that Missouri courts have allowed joinder of crimes occurring twelve to twenty months apart, but says that no court "... has been so bold as to imply that a separation for as long ... as ... nearly three years ... does not defeat joinder." Perhaps, if Defendant had advanced a line of reasoning that explained how the length of time between murders negated similarities in the two crimes, we might consider this argument. Since Defendant advanced no such argument nor cited authority for his proposition, we are left to reject this argument.

Defendant's argument regarding dissimilar tactics advances the reasoning that tactics

employed in multiple crimes must be similar to authorize joinder under the "same or similar character" rationale. Missouri's seminal case involving joinder under the same or similar character rationale is *Harris*, 705 S.W.2d at 549–550. Regarding similar tactics, *Harris* says that "similar tactics *are sufficient* to constitute acts 'of the same or similar character,' thus making joinder permissible." *Id.* at 550 (emphasis added). Cases following *Harris* say that similar tactics are *sufficient* or will *suffice* to show that crimes are of the same or similar character. *See State v. Tripp*, 939 S.W.2d 513, 518[2] (Mo.App.1997); *State v. Howton*, 890 S.W.2d 740, 744 (Mo.App.1995); *State v. Perkins*, 826 S.W.2d 385, 389[6] (Mo.App.1992). These cases simply stand for the proposition that a showing of similar tactics is sufficient reason for joinder of offenses under the same or similar character rationale; they do not, however, hold that similar tactics *must* exist before joinder is permissible under the same or similar character standard.

In *Harris*, the court examined joinder in federal courts and other jurisdictions to define the language "same or similar character." 705 S.W.2d at 549. Quoting from *United States v. Werner*, 620 F.2d 922 (2d Cir.1980), where the Second Circuit interpreted Federal Rule 8(a), the *Harris* court said:

> " '... Rule 8(a) is not limited to crimes of the "same" character but also covers those of "similar" character, which means "[n]early corresponding; resembling in many respects; somewhat alike; have general likeness." Webster's New International Dictionary (2d ed.).' "

705 S.W.2d at 549.

The court in *Harris* further stated:

> "Federal and state courts alike rely heavily upon the specific facts at hand in determining whether joinder is proper in that the offenses are 'of the same or similar character.' "

*Id.*

Several federal cases decided after *Werner* and *Harris* took a broader view of "same or similar" offenses under the federal rules. *See, e.g., United States v. Coleman*, 22 F.3d 126 (7th Cir.1994). *Coleman* holds that Rule 8(a) requires nothing more than similarity of the offenses to be joined. *Id.* at 131. According to *Coleman*, the "short-period-of-time/evidence overlap" formula is not the exclusive measure of whether "same or similar" offenses are properly joined. *Id.* at 131–34. Noting that the similarity of character of two offenses does not depend significantly upon their separation in time, the *Coleman* court held that a literal reading of Rule 8(a) requires a comparison of the offenses charged for "categorical, not evidentiary similarities." *Id.* at 133. Consequently, "if offenses are of like class, although not connected temporally or evidentially, the requisites of proper joinder should be satisfied so far as Rule 8(a) is concerned." *Id.*

■ We need not decide if the "same or similar" language in Missouri's rules and statutes should be read as *Coleman* suggests. Here, there are specific facts that show that these murders were, at least, of a similar character. Both victims were married to Defendant. Both victims had separated from Defendant before their deaths. Both victims had made appointments to meet with Defendant before they died. There was evidence pointing to physical battery of both victims at or near the time of their deaths. Enough similarities existed between the two murders to allow joinder under the "same or similar character" rationale. Defendant's second point is denied.

In his third point, Defendant complains that the trial court erred by not severing the two murder counts. Defendant argues that he suffered substantial prejudice because of these two counts being tried together. We find that Defendant did not satisfy his burden under § 545.885.2 or Rule 24.07 to establish that trying both murder counts simultaneously resulted in substantial prejudice.

In pertinent part, § 545.885 states:

> "1. Notwithstanding Missouri supreme court rule 24.07, whenever two or more offenses are jointly charged in an indictment or information, the court shall order both or all offenses to be tried together.

> "2. If it appears that a defendant or the state is substantially prejudiced by a

joinder of the offenses for trial, upon a written motion of the defendant or the state and upon a particularized showing of substantial prejudice, the court may grant a severance of offenses or provide whatever relief justice requires. For purposes of this section, *'substantial prejudice' shall mean a bias or discrimination against the defendant or the state which is actually existing or real and not one which is merely imaginary, illusionary or nominal."* (emphasis added).

Rule 24.07 states:

"When a defendant is charged with more than one offense in the same indictment or information, the offenses shall be tried jointly unless the court orders an offense to be tried separately. An offense shall be ordered to be tried separately only if:

"(a) A party files a written motion requesting a separate trial of the offense;

"(b) A party makes a particularized showing of substantial prejudice if the offense is not tried separately; and

"(c) The court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense."

■ The grant or denial of a motion for severance is left up to the sound discretion of the trial court. *State v. Conley,* 873 S.W.2d 233, 238[17] (Mo.banc 1994) (quoting *Duren,* 556 S.W.2d at 20). No abuse of discretion exists in denying a motion to sever if the motion does not state sufficient facts demonstrating a particularized showing of substantial prejudice as required by both § 545.885.2 and Rule 24.07(b). *See State v. Reichert,* 854 S.W.2d 584, 600[34] (Mo.App.1993).

■ When a defendant asserts that a trial court should have severed charges, we must first determine if the offenses are properly joined, then determine if the trial court should have ordered severance. *Jones,* 863 S.W.2d at 356[3]. Once joinder is deemed proper, the decision whether to sever is discretionary. *Id.* at 357[5]. Defendant, however, spent a good deal of time in his motion to sever arguing that joinder was improper. Since Points I and II of this opinion found that joinder was proper, we need not address

that part of Defendant's motion and suggestions further.

■ Defendant's motion to sever and supporting suggestions also argued that evidence from one count would "bleed over" to the other count thereby bolstering the state's case as a whole. He also argued that admission of evidence "only because of the joinder of these offenses" would prejudice the Defendant. Next, Defendant stated that the complex and circumstantial nature of the evidence would prevent jurors from keeping the evidence straight and keeping each offense separate in their minds. Yet, Defendant did not demonstrate, as required by both § 545.885.2 and Rule 24.07(b), the substantial prejudice or "real bias or discrimination" that would result from trying both cases together. Defendant's argument on appeal proceeds in the same conclusory manner. Thus, it was not an abuse of discretion for the trial court to deny Defendant's motion to sever. *Reichert,* 854 S.W.2d at 600.

■ However, a trial court is under a continuing duty to determine if fairness dictates severance. *State v. Cook,* 673 S.W.2d 469, 472[2] (Mo.App.1984). Defendant asserts that the following factors at trial prejudiced him and mandated severance: (1) the large number of witnesses; (2) the expert testimony; (3) the complexity of the evidence; and (4) the degree of difficulty in keeping the facts and issues in each count separate. Defendant argues that these factors existed at trial, the state exploited these factors, and he was thereby prejudiced. Again, Defendant never makes a particularized showing of substantial prejudice resulting from these factors. Thus, Defendant has not satisfied his burden of demonstrating that the trial court erred by not ordering severance during the course of the trial. We conclude that there was no abuse of discretion in this instance. Point III is, therefore, denied.

*Points IV and V: Christy Kelley's Statements As Hearsay*

In his fourth and fifth points, Defendant contends that the trial court erred in allowing the State's witnesses Kathy Weston and

Dana Proffitt to testify about statements made to them individually by Christy. He argues that such testimony was hearsay, that neither statement was admissible under any exception to the hearsay rule, and that he was substantially and improperly prejudiced by such evidence.

"A hearsay statement is any out-of-court statement used to prove the truth of the matter asserted." *State v. Shurn,* 866 S.W.2d 447, 457[19] (Mo.banc 1993). "Hearsay statements are generally inadmissible." *Id.* at 457–58[19].

We quote the challenged part of Kathy Weston's testimony:

"Q. [by the State] Ms. Weston I'd like to refer you back to March the 9th of 1993. Was that the date that—the receipt of the second batch of roses?

"A. Yes, it was.

"Q. Did you have a conversation with Christy Kelley either that day or the following?

"A. It was the day following the morning—she walked into work that day. She walked in and explained—or exclaimed, well there won't be any more roses. And I asked her why, and she said they had an argument.

"Q. When you say "they" who do you mean?

"A. Doyle and Christy had an argument that night.

"Q. The defendant and the victim?

"A. Yes, the defendant.

"Q. Okay.

"A. She said they discussed her marriage, she said she didn't want to be married any longer, that she didn't love him anymore, and she wanted to remain friends.

"Q. Did she indicate whether the defendant had responded to that in any fashion?

"A. Yes. She told me that he said if he couldn't have her, no one would."

We also set out the questionable part of Dana Proffitt's testimony. It relates Dana's conversation with Christy about three weeks before Christy's death.

"Q. [to Proffitt] In the course of this conversation with Christy Kelley, did she relate to you a conversation she had with the defendant?

"A. Yes.

"Q. What did she tell you?

"A. She told me that he had found out she was seeing Mike.

"Q. Mike is who, if you know?

"A. Mike Hulette. It was a guy she was seeing, had been going out with a few times.

"Q. And what did she say happened in their conversation next?

"A. In the course of their conversation she said Doyle was very upset over her seeing Mike and he told her he'd just as soon see her dead as with anyone else."

At trial, Defendant objected to this testimony on the basis that it was hearsay. In response, the State claimed Weston's and Proffitt's testimony was admissible under the present state of mind exception to the hearsay rule, citing *State v. Ford,* 639 S.W.2d 573 (Mo.1982), *State v. Kennedy,* 842 S.W.2d 937 (Mo.App.1992), and *State v. Singh,* 586 S.W.2d 410 (Mo.App.1979). The trial judge overruled Defendant's objection, stating:

"[I]t appears as though accident at least is a possibility suggested by the defense in its cross-examination of certain witnesses.... And in this case it appears ... this exception to the hearsay rule should be made.... [T]he Court ... [relies] primarily upon the case of *State v. Kennedy* and the cases cited therein...."

On appeal, the State concedes that the quoted statements by Christy to Weston and Proffitt were hearsay and that portions thereof contained multiple hearsay, sometimes called "hearsay within hearsay." O'BRIEN, MO. LAW OF EVIDENCE, § 11–5 (1996). The multiple hearsay exists in Christy's statements to Weston and Proffitt about Defendant's response, i.e., "if he couldn't have her, no one would[ ]" and "he'd just as soon see her dead as with anyone else."

■ Multiple hearsay is deemed admissible *only* if each of the hearsay statements

independently satisfies some exception to the hearsay rule. *See State v. Reagan*, 654 S.W.2d 636, 639 (Mo.App.1983). The State recognizes this latter rule and says each part of Christy's out-of-court statements to Weston and Proffitt met an exception. Specifically, the State avers that Defendant's statements to Christy, although hearsay, were independently admissible under the "admission" exception to the hearsay rule and that Christy's statements to Weston and Proffitt were admissible under the "present state of mind" exception to such rule.

■■■■ We need examine only the "state of mind' exception as we can find no justification for admitting Christy's statements to Weston and Proffitt under that exception.[4] Briefly described, this general rule is that extrajudicial statements of a declarant-victim's present state of mind are excepted from the hearsay ban, *provided* the declarant's state of mind at the time is an issue in the case. *United States v. Brown*, 490 F.2d 758 (D.C.Cir.1973). *See also State v. Boliek*, 706 S.W.2d 847, 850 (Mo.banc 1986); *Ford*, 639 S.W.2d at 574–75; *State v. Pagano*, 882 S.W.2d 326, 336[15] (Mo.App.1994); *Kennedy*, 842 S.W.2d at 942–44; *Singh*, 586 S.W.2d at 417–19.

■■■ From *Singh* onward, Missouri courts have relied on *Brown* to define the scope of the state of mind exception. Under *Brown*, the exception cannot be used to allow hearsay testimony offered primarily to prove the state of mind of an accused; rather, the rule only has application where the proffered hearsay shows primarily the then state of mind of the declarant *and* declarant's state of mind, in itself, is probative of an ultimate issue in the case. 490 F.2d at 774–780.

■■■ Most commonly, courts recognize and approve the state of mind exception in homicide cases where an accused claims self-defense, suicide, or accidental death. *Id.* at

767. In such instances, hearsay statements made by the victim that illustrate his or her present state of mind are relevant and the need for such statements ordinarily overcomes any possible prejudice. *Id. See Singh*, 586 S.W.2d at 418. Where an accused claims self-defense, the deceased's state of mind is relevant to the issue of which participant in the killing was the aggressor. *See Ford*, 639 S.W.2d at 575. Where a defendant concedes his or her presence and involvement in a victim's death but claims an accident or suicide caused the death, the deceased's statements as to fear of guns or similar state of mind are relevant to rebut these defenses. *See Singh*, 586 S.W.2d at 419.

As earlier indicated, at trial the State argued that the present state of mind exception applied and the testimony of Weston and Proffitt was admissible because Defendant claimed Christy's death was accidental; hence, Christy's state of mind was relevant as it tended to rebut Defendant's accident defense. However, that exact same argument was made and rejected in *State v. Post*, 901 S.W.2d 231 (Mo.App.1995). In *Post*, the state claimed that the defendant drowned his wife in a bathtub. The defendant claimed she drowned in a bathtub while he was away from the scene. At trial, the court admitted out-of-court statements of the victim via other witnesses to the effect that the victim wanted or intended to divorce the defendant. The state asserted that because the defendant contended the death was accidental, the victim's state of mind was relevant. The *Post* court concluded that the trial court committed prejudicial error by admitting the statements because the victim's state of mind was not relevant.

*"The accident cases referred to in the Singh case are those situations where the defendant as the actor causing the death is undisputed but the issue raised is whether*

---

4. We agree that Defendant's statements to Christy fall under the admissions exception to the hearsay rule. Both statements, i.e., "if he couldn't have her, no one would[ ]" and "he'd just as soon see her dead as with anyone else[,]" tend to incriminate Defendant, indicating that he considered Christy's death as the preferable alternative to her romantic involvement with another man. *See State v. Isa*, 850 S.W.2d 876,

894 (Mo.banc 1993). Furthermore, both statements are relevant to the material issues of intent and deliberation. *See State v. Davis*, 877 S.W.2d 669, 677[12] (Mo.App.1994). Thus, Defendant's statements to Christy are admissions, are exceptions to the hearsay rule, and satisfy the first requirement for the introduction of multiple hearsay.

*he acted intentionally or accidentally.* Defendant here denied any participation in the death of his wife and denied that he was present when the incident which caused it occurred. Under those facts the decedent's particular state of mind that she was unhappy with her husband has no relevance." (emphasis supplied).

901 S.W.2d at 236[9].

As in *Post,* here Defendant denied any involvement in causing Christy's death and claimed that when she died he was not present. Defendant did not claim self-defense, did not assert that Christy died by her own hand, did not admit that he was the actor but caused Christy's death accidentally, nor did Defendant inject any other plausible issue that would justify an inquiry into the victim Christy's state of mind. Given the facts of this case, Christy's state of mind "as to her belief in the future of the marriage" and "as to her future relations with [Defendant]" had no relevance. *See Post,* 901 S.W.2d at 236[9]. Based on *Brown* and *Post,* we conclude that Christy's statements to Weston and Proffitt were not admissible under the state of mind exception to the hearsay rule.

The State further argues that Christy's statements to Weston and Proffitt were admissible as they were "relevant to refute the defense's suggestion that the separation between [Defendant] and Christy had been amicable, with its corresponding suggestion that [Defendant] therefore was not responsible for her death." This argument fails because the State—not Defendant—first injected the issue of whether Defendant and Christy's separation was amicable. Thus, in his opening statement the prosecutor told the jury that on April 23, 1993, Christy and Defendant "were estranged" and were living at different addresses. The prosecutor then stated that "there will be evidence ... from a number of witnesses that will indicate that the relationship ended in murder." The State then called Windell Mayes (Christy's father) as its initial witness. During Mr. Mayes' direct examination, the prosecutor elicited from him testimony that Defendant and Christy's separation was not amicable. Mr. Mayes testified that he was present when Christy moved some furniture from Defendant's house and that the situation was "very tense."

Under the doctrine of curative admissibility, "[w]here the defendant has injected an issue into the case [via inadmissible evidence], the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." *State v. Lingar,* 726 S.W.2d 728, 734–35 (Mo.banc 1987) (citing *State v. Starr,* 492 S.W.2d 795, 799 (Mo.banc 1973)). *See also Shurn,* 866 S.W.2d at 458; *State v. Chambers,* 891 S.W.2d 93, 103 (Mo.banc 1994). However, this doctrine has no applicability here because the State first injected the issue of the parties' estrangement and non-amicable separation.

The State cites no authority for the notion that it can submit incompetent evidence solely to refute an issue the defense has not yet injected into the case. Our independent research reveals no such rule. Since the State first injected the "amicable separation" issue into the case, Christy's statements to Weston and Proffitt did not qualify as rebuttal evidence, the statements remained inadmissible, and their admission only served to improperly bolster an inference negative to Defendant.

The State also argues that, despite the hearsay nature of Christy's statements to Weston and Proffitt, such evidence "was relevant and admissible because it established [Defendant's] motive for Christy's death...." To explain the State's argument, we quote this excerpt from its brief:

"[Defendant] is closer to the mark when he argues that the state did not offer this evidence because of what it showed about Christy's state of mind, but what it showed about [Defendant's] state of mind, in that Christy's statements that she no longer loved [Defendant] and did not want to be married to him, and [Defendant's] response thereto, provided [Defendant] with a motive for Christy's murder."

The Eastern District rejected a similar argument in *State v. Randolph,* 698 S.W.2d 535 (Mo.App.1985). There, witnesses testi-

fied over objection that the victim had said that the defendant had robbed Larry Jackson and placed him in a bathtub full of water. Another witness testified, again over objection, that victim was afraid of the defendant. On appeal, the state argued that the state of mind of the victim was relevant to prove defendant's motive for killing his victim. The Eastern District rejected that argument, saying:

"Motive concerns the state of mind of the [defendant], not that of the victim.

. . . .

"It was the motive of the [defendant] or the state of mind of the [defendant] to which the prosecution refers, not the state of mind of the victim. This court can conceive of no justification for admitting what the state recognizes is hearsay testimony. It was not relevant to the decedent's state of mind except to show that he feared the [defendant]. His alleged fear of the [defendant] does not even show a motive. One does not kill another because the other is afraid of him. Self-defense was not an issue."

*Id.* at 540, 541.

■ *Randolph* applies to this case. The state of mind exception does not justify or permit hearsay evidence when the primary purpose thereof is to show motive or any other state of mind of Defendant. *Randolph* teaches that although the State is entitled to prove motive in a murder case and has wide latitude in doing so, motive can no more be proved by inadmissible and objected-to hearsay than any other fact. Moreover, *Randolph* rejects any notion that the "present state of mind" exception renders hearsay evidence admissible to prove a defendant's state of mind or motive. Following the views expressed in *Brown* and *Randolph,* we hold that otherwise inadmissible hearsay cannot be admitted under the state of mind exception as direct evidence of Defendant's state of mind or a true indication of Defendant's motive.

■ In reaching this conclusion, we recognize that evidence of marital break-up or threats is admissible and is probative of a defendant's intent, motive, or culpability

where proof is by non-hearsay. *See Pagano,* 882 S.W.2d at 331. As explained in *State v. Copeland,* 928 S.W.2d 828 (Mo.banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997):

"Not all out-of-court statements are hearsay. The hearsay rule only prohibits admission of evidence of out-of-court statements offered to prove the truth of the out-of-court declaration. Defendant overlooks the well-established 'verbal acts' rule. Utterances made contemporaneously with or immediately preparatory to an act which is material to the litigation that tends to explain, illustrate or show the object or motive of an equivocal act and which are offered irrespective of the truth of any assertion they contain, are not hearsay and are admissible." (citations omitted).

*Id.* at 848[50,51].

A similar explanation is found in *State v. Joiner,* 823 S.W.2d 50 (Mo.App.1991):

"The testimony of a witness regarding the statement of another is hearsay only when the statement is offered as proof of the matters stated therein. The state did not offer the statements for the truth of the matter asserted. Rather, the evidence was offered to show knowledge and motive. This was a permissible use of the statement." (citations omitted).

*Id.* at 55. However, these well-recognized principles do not aid the State because at trial the State conceded that Christy's statements to Weston and Proffitt were hearsay.

The trial court clearly considered this evidence hearsay but at the urging of the prosecuting attorney, admitted it under the present state of mind exception. Thus, as he considered Defendant's objection to this evidence the trial judge said: "The Court is faced squarely with the state of mind exception to the hearsay rule."

■ Nothing in this record suggests that the trial court ever considered nor did the State ever seriously urge that the challenged testimony was not offered to prove the truth of the victim's statement and thus was not hearsay. No limiting instruction was requested and none was given. When out-of-

court statements of a homicide victim that inferentially implicate a defendant are admitted, the minimum requirement is a limiting instruction. *Brown,* 490 F.2d at 766, n. 25.

 In summary: (1) Weston's and Proffitt's statements were hearsay; (2) neither the state of mind exception nor any other of the reasons advanced by the State rendered the statements admissible; and (3) the admission of the questioned hearsay constituted prejudicial error. Our conclusion that the error was prejudicial is supported by the fact similarities among this case and *Brown, Post,* and *Randolph.* The conviction of Defendant for the death of Christy must be reversed and remanded because of the admission of such prejudicial testimony.[5]

*Point VI: Diana's Statement As Hearsay: Plain Error Review*

Defendant's sixth point maintains that the trial court committed plain error by allowing Mrs. Stepp to testify concerning a statement made by Diana to her mother approximately two weeks before Diana's death. Mrs. Stepp testified:

"Q. [to Stepp] During the time that Diana lived with you, did she express any fear of the defendant?

"A. Yes. On the first day that she moved back, and she did."

 Defendant lodged no objection when this testimony came in and he did not complain about it in his motion for new trial. As a result, Defendant did not properly preserve this claim of trial court error for appellate review. *State v. Griffin,* 662 S.W.2d 854, 859[5] (Mo.banc 1983); *State v. Walden,* 861 S.W.2d 182, 187[14] (Mo.App.1993).

Defendant argues that we should exercise our discretion to give plain error review because allowing the hearsay testimony into evidence resulted in manifest injustice or a miscarriage of justice. Apparently Defendant recognizes that to succeed under the plain error standard he must show trial court error *and* that the assigned error had such a substantial effect upon his rights that manifest injustice or a miscarriage of justice would result if the error was not corrected. Rule 30.20;[6] *Walden,* 861 S.W.2d at 187[15].

 In finding the facts, a jury is permitted to consider inadmissible hearsay that goes in the record without objection. *State v. Thomas,* 806 S.W.2d 138, 140[2] (Mo.App.1991) (quoting *State v. Thomas,* 440 S.W.2d 467, 470[3](Mo.1969)). "Where no objection is made to hearsay, its admission is not plain error." *State v. Esposito,* 899 S.W.2d 904, 907[6] (Mo.App.1995).

 Additionally, there was evidence that Defendant admitted to Bell that he had killed Diana. Also, the jury could have viewed the evidence concerning the St. Christopher medal as particularly damaging to Defendant. No manifest injustice or miscarriage of justice resulted from allowing the jury to consider Mrs. Stepp's testimony given the direct evidence of Defendant's guilt via his admissions and Defendant's weak explanation of how he came into possession of Diana's St. Christopher medal. Point VI is denied.

*Point VIII: Failure to Suppress Testimony of Bell*

Defendant's eighth point asserts that the trial court erred in overruling his motion to

---

5. In reaching this conclusion, we considered but rejected the State's contention that Defendant did not properly preserve Points IV and V for appellate review. At trial, Defendant objected to the admission of the Weston statements on the grounds of hearsay. He again raised the hearsay objection to the Proffitt statements, adding non-specific objections that the statements were "prejudicial" and "not relevant." Contrary to the State's assertions on appeal, Defendant's objection on the basis of "inadmissible hearsay" or "hearsay" and reiteration of his hearsay complaints in his motion for new trial preserved for review the question of these statements' admissibility as hearsay statements. *See State v. Penn,*

413 S.W.2d 281, 283[5] (Mo.1967) (Holding, objection that testimony "would be hearsay adequately preserved the question for appellate review."); *State v. Newson,* 898 S.W.2d 710, 715 (Mo.App.1995) (Holding, citing "hearsay" as a basis for objection preserved the claim of error for appellate review.)

6. Rule 30.20 provides in pertinent part, "[P]lain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

suppress Bell's testimony about Defendant's admissions of murder and "[p]lainly erred in allowing the testimony of Bell about these statements" at trial. Defendant claims that Bell was acting as an agent of the prosecution when he elicited statements from Defendant that he (Defendant) killed Diana and Christy. Defendant argues that Bell surreptitiously conducted a custodial investigation of him after he was charged and represented by counsel. Relying on *State v. McMullan,* 713 S.W.2d 881 (Mo.App.1986), Defendant avers that Bell's inquiries of him were the functional equivalent of a police interrogation, and as such violated his rights to counsel and to due process of law. *See Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

 Before trial, Defendant moved to suppress the testimony of Bell. After a hearing, the trial court overruled the motion. Defendant never objected to Bell's testimony at trial. In Missouri, when a motion to suppress is denied and the evidence is offered at the subsequent trial, timely objection to the evidence must be made in order to preserve that question for appellate review. *See State v. White,* 907 S.W.2d 366, 369[5] (Mo.App.1995); *State v. Rider,* 664 S.W.2d 617, 619[2] (Mo.App.1984).

Nevertheless, the trial court did not err in overruling Defendant's motion and admitting Bell's testimony. At the suppression hearing, Lt. Terry Moback of the Jasper County sheriff's department testified that Bell was transferred into the same "pod" with Defendant because a cell was needed for an incoming prisoner. Moback denied that he or anyone in his department had instructed Bell to seek information from Defendant. Dick Godsey, an employee of the Jasper County prosecuting attorney's office, testified that Bell initiated contact with the prosecutor's office and offered to provide information he had already obtained from Defendant. He also testified that no one from the prosecutor's office made an effort to enlist Bell before Bell contacted the prosecutor's office. Bell testified that he was not instructed to collect evidence from Defendant and that no one had suggested that he collect evidence from Defendant.

Defendant called Michael Church, a prisoner in the Jasper County jail, who claimed that he saw Bell with two individuals who arrived at the jail in a police car before he was moved to Defendant's pod. He also claimed that Bell indicated that he would be giving perjured testimony at Defendant's preliminary hearing.

After hearing this evidence, the trial judge stated: "The Court is unable to find any evidence that this witness is an agent of the government or an agent of the police or an agent of the prosecuting attorney's office." He then overruled the motion to suppress.

 In reviewing a trial court's ruling on a motion to suppress, an appellate court will affirm the ruling if the evidence is sufficient to sustain the trial court's finding. *State v. Blankenship,* 830 S.W.2d 1, 14[18] (Mo.banc 1992). All facts and reasonable inferences therefrom are to be reviewed in the light most favorable to the order. *Id.* "The weight of the evidence and credibility of witnesses are questions for the trial court's resolution." *State v. Perrone,* 872 S.W.2d 519, 521[5] (Mo.App.1994). Our review is limited as to whether sufficient evidence existed to support the trial court's ruling. *State v. Burkhardt,* 795 S.W.2d 399[6] (Mo. banc 1990). Reviewing the evidence at the suppression hearing in light of these principles, we find no error by the trial court in allowing Bell's testimony regarding Defendant's admissions.

In reaching our conclusion, we do not ignore Defendant's contention that his convictions should be reversed under the plain error rule because in July 1995, more than seven months after the entry of judgment and sentence, Bell signed an unverified statement in which he purportedly recanted his trial testimony. In his "recantation" statement, Bell claimed that "law enforcement personnel" deliberately planted him in the jail area with Defendant for the purpose of obtaining statements from Defendant. Apart from the obvious fact that this "evidence" was never before the trial court, it must be disregarded in any event as evidence contrary to the trial court's ruling. *See Blankenship,* 830 S.W.2d at 14[18]; *Perrone,*

872 S.W.2d at 521[3]. Despite Bell's alleged recantation, there exists in this record ample testimony from other witnesses to support a finding that Bell was not an agent for the State. Again, it is for the trial court to weigh the evidence and assess the credibility of witnesses. *See Perrone,* 872 S.W.2d at 521, 522[5]. Under this court's limited review, we cannot say there was error in allowing Bell to testify about Defendant's admissions. Point VIII is denied.

*Point X: Plain Error Review of Bell's Testimony About Threats*

Defendant's tenth point contends that the trial court committed plain error when it did not, *sua sponte,* declare a mistrial when Bell testified about threats against him without saying anything that would directly or indirectly connect Defendant to those threats. The testimony of which Defendant complains came during Bell's direct and cross-examination.

"Q. [by Prosecutor] Sir, let me ask you this. You are in prison now?

"A. Yes, sir.

"Q. Is there a prison terminology for someone who testifies against some one else?

"A. Excuse me?

"Q. What do you guys call somebody in prison who testifies?

"A. They have been calling me dead. That's what they have been calling me.

"Q. So you're [sic] being here and you're [sic] talking to us is dangerous for you, isn't it?

"A. Yes, sir.

"Q. Do you have some special living arrangements because of your willingness to testify?

"A. Yes, they have got me on a protective custody unit.

"Q. What's that mean?

"A. It means that somebody is trying to kill me and that the Department of Corrections just don't want that to happen at that institution."

Defense counsel's cross-examination of Bell on this subject was as follows:

" "Q. [by defense counsel] Mr. Bell, let me get this straight. You're not here today telling the jury, are you, that somebody in particular is out to get you over you testifying in this, are you? You don't know of anybody in particular out to get you, do you?

"A. Well, after the first time I testified here in this court, I went back to prison and I had gotten—

"Q. Mr. Bell, it's a pretty easy question. Isn't it—

[Prosecutor objected that counsel was not letting the witness finish; trial judge directed witness to answer the question]

"A. When I got back to prison, I asked for protective custody because I was going to be a witness—or I had already came to an arraignment or preliminary hearing. When I got back to prison, they—inmates had come up to me and told me they had gotten letters from an individual who was in the county jail and that they was supposed to do something to me to keep me from testifying in this trial.

"Q. But you don't know who that was, do you, from the Jasper County Jail?

"A. Yes, I know who it was."

On redirect, the prosecutor asked Bell which Jasper County prisoners had asked prison inmates to hurt Bell. Bell answered: "[T]here was two of them. They were Scotty Sours and Mike Church."

Defense counsel did not object to this testimony and did not assign its admission as trial court error in his motion for new trial; consequently, we can only review this point under the plain error standard of Rule 30.20. *See State v. Jordan,* 834 S.W.2d 900, 901 (Mo.App.1992).

This court explained the constraints of plain error review in *State v. Varvera,* 897 S.W.2d 198 (Mo.App.1995).

"*Plain error* and *prejudicial error* are not synonymous terms. Relief under the plain error standard is granted only when the alleged error so substantially affects a defendant's rights that a manifest injustice or miscarriage of justice inexorably results if left uncorrected. Appellate courts use the plain error rule sparingly and limit its

application to those cases where there is a strong, clear demonstration of manifest injustice or miscarriage of justice. The determination of whether plain error exists must be based on a consideration of the facts and circumstances of each case. A defendant bears the burden of demonstrating manifest injustice or miscarriage of justice." (citations omitted).

*Id.* at 201[6–9].

In urging his entitlement to reversal under the plain error standard, Defendant relies almost exclusively on *State v. Hicks*, 535 S.W.2d 308 (Mo.App.1976). He characterizes *Hicks* as holding that the admission of threat evidence that is unconnected to the accused "rises to the level of manifest injustice or miscarriage of justice." Defendant mischaracterizes *Hicks*.

 *Hicks* was not reviewed or decided under the plain error standard. In *Hicks*, this court found that defense counsel acted timely, both in objecting to the prosecutor's opening remarks about threat evidence and in requesting a mistrial. *Id.* at 311. Here, there were no objections to the evidence and no mistrial request; hence, reliance on *Hicks* is misplaced. Moreover, there were in *Hicks* a combination of other elements and circumstances peculiar to that case that led to reversal. 535 S.W.2d at 311–13. In *Hicks* the facts strongly suggested that the prosecutor acted in bad faith when he injected the "threat" evidence. Here the prosecutor in direct examination only raised the general subject of potential harm to Bell stemming from his testimony. It was defense counsel—not the prosecutor—who asked Bell if he had been specifically threatened by any person. A defendant may not complain about evidence brought into the case by his lawyer's own questions or conduct. *See State v. Byrd*, 676 S.W.2d 494, 500 (Mo.banc 1984); *State v. Middleton*, 854 S.W.2d 504, 516 (Mo.App.1993). "Where a defendants fails to object and actively joins in the presentation of evidence to the jury, he may not argue later that the admission of the evidence was error." *State v. Rowe*, 806 S.W.2d 122, 127 (Mo.App.1991). *See also State v. Tatum*, 824 S.W.2d 22, 27 (Mo.App.1991).

In *Hicks*, the prosecutor's only apparent purpose in offering the threat evidence was to have the jury improperly infer that the defendant had made the threats. Here, the State's initial questions to Bell might have been viewed as an effort to prop up Bell's credibility by showing he would testify despite high potential for harm by other inmates. Granted, this former purpose would also be improper; yet, defense counsel may have opted as trial strategy to forego objections and concentrate instead on showing that Bell was an experienced "jailhouse snitch" who was so focused on getting special favors and deals that he would perjure himself. On cross-examination defense counsel did successfully elicit testimony from Bell that he was to testify against another inmate and that a forgery charge against him had not been pursued in return for his testimony against Defendant.

 A trial judge's function is not to help counsel in trying cases; consequently, a trial judge should act *sua sponte* only in exceptional circumstances. *State v. Enloe*, 914 S.W.2d 44, 46[2] (Mo.App.1996). Without objection or other request for relief, a trial court's options are narrowed to uninvited interference in the lawsuit, *State v. L . . . R . . .*, 896 S.W.2d 505, 510[10] (Mo.App.1995), thus subjecting the trial court to the accusation of trying " 'my lawsuit.' " *See State v. Drewel*, 835 S.W.2d 494, 498 (Mo.App.1992). Moreover, declaring a mistrial in a criminal case is always a drastic remedy and should only be employed in the most extraordinary circumstances. *Drewel*, 835 S.W.2d at 498[12].

 After fully examining Bell's threat testimony about which Defendant complains, we find no exceptional circumstances warranting plain error relief.

Finally, Defendant's admission to Bell that he had killed Diana was direct evidence of his guilt. *See State v. Stokes*, 638 S.W.2d 715, 723 (Mo.banc 1982). Even if the prosecutor overstepped his bounds in initially questioning Bell generally about the danger to him from testifying—an issue we need not decide—there was no miscarriage of justice or manifest injustice that resulted from this. Point X is denied.

*Point XIV: Claimed Exculpatory Evidence*

Defendant's fourteenth point challenges the trial court's exclusion of evidence that Defendant claims inculpates Richard Blackwood in the murder of Diana. The record reveals that Defendant made eight offers of proof regarding Blackwood that Defendant claimed linked Blackwood to the killing of Diana and tended to exculpate Defendant. The record further shows that the trial court ruled that the offers of proof regarding Blackwood were inadmissible.

 A trial court has broad discretion when ruling on the relevance of evidence. *State v. Huse*, 842 S.W.2d 579, 585 (Mo.App. 1992). An appellate court will not interfere with a trial court's decision regarding the relevance of evidence absent a showing that the trial court abused its discretion. *Id.*

 The parameters for admitting evidence designed to exculpate an accused and inculpate another person are well defined. Evidence directly connecting another person to the crime in question and from which a jury might clearly infer that person is guilty (as opposed to the accused) would be admissible. *Stokes*, 638 S.W.2d at 723. However, evidence of another person's motive or opportunity for committing the crime in question would be inadmissible unless there is proof directly connecting the other person with the crime. *Huse*, 842 S.W.2d at 585; *State v. Umfrees*, 433 S.W.2d 284, 287[4] (Mo.banc 1968). Evidence casting only "bare suspicion" on another person or raising only a "conjectural inference" that the other person committed the crime would be inadmissible. *State v. Clark*, 859 S.W.2d 782, 787–788[4] (Mo.App.1993); *State v. LaRette*, 648 S.W.2d 96, 103[9] (Mo.banc 1983).

 None of the proffered evidence regarding Blackwood directly connected him with the murder of Diana. Defendant's strongest attempt to directly connect him to the murder involved the offered testimony of witness Phillips who claimed that Blackwood called him to inform him of Diana's murder between 8:00 a.m. and 8:30 a.m. on the

morning her body was found. Defendant believed this inculpated Blackwood because Diana's body was not discovered until approximately 9:30 a.m. and her identity had not been established until after 9:30 a.m. However, another witness testified that Blackwood informed a group of people at Lil's Cafe of Diana's murder between 10:00 a.m. and 11:00 a.m. and was making phone calls then.

This evidence does not directly connect Blackwood with Diana's murder. At most, this evidence suggests Blackwood's advance knowledge that Diana was dead, but does not connect Blackwood with the cause of Diana's death. However, the testimony that Blackwood was making phone calls between 10:00 a.m. and 11:00 a.m. raises the possibility that witness Phillips was mistaken as to the time of his conversation with Blackwood. We find the trial court did not abuse its discretion by rejecting this evidence. Point XIV is denied.[7]

In No. 19988, we affirm the judgment of conviction for the murder of Diana; we reverse the judgment of conviction for the murder of Christy and remand for further proceedings.

## POST CONVICTION APPEAL—NO. 20892

Points VII, IX, XI and XII are directed to the motion court's order denying Defendant's Rule 29.15 motion. In Points VII, XI and XII Defendant contends his trial counsel was ineffective; in Point IX he argues that the trial court lacked jurisdiction to impose sentence.

Appellant review of a denial of a Rule 29.15 motion is limited to determining whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(j); *State v. Ervin*, 835 S.W.2d 905, 928 (Mo.banc 1992). "The . . . findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made." *Id.* at 928[42].

---

7. Defendant's fifteenth point charges trial court error stemming from refusal to admit evidence that allegedly inculpated Charles Ray Warren in the murder of Christy. Reversal of Defendant's conviction for the murder of Christy renders this point moot.

To prevail on a claim of ineffective assistance of counsel, a movant must show: First, that trial counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances; and, second, that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). This prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

 If it is easier to dispose of a claim of ineffective assistance of counsel on the ground that there was not sufficient prejudice, a court should follow that course. *Sidebottom v. State*, 781 S.W.2d 791, 796[9] (Mo. banc 1989). There is no reason for a court to address both components of the test if the defendant fails to make a sufficient showing on one. *Id.* Review of a Rule 29.15 judgment begins with the strong presumption that counsel is competent and a movant has the "heavy burden" of proving counsel's ineffectiveness by a preponderance of the evidence. *Leisure v. State*, 828 S.W.2d 872, 874 (Mo. banc 1992); *Amrine v. State*, 785 S.W.2d 531, 534[3] (Mo.banc 1990). *See* Rule 29.15(h).

*Point VII: No Objection To Mrs. Stepp's Testimony Of Diana's Fear*

In his seventh point, Defendant argues that his trial counsel was ineffective for failing to object to the testimony of Mrs. Stepp that approximately two weeks before her death Diana had expressed her "fear of the defendant." He argues that such testimony was hearsay, was irrelevant, and should have been excluded. He contends that the admission of that testimony was so prejudicial as to affect the outcome of the trial; hence, the motion court erred when it rejected his claim for postconviction relief.

On this issue, the motion court held that receipt of this evidence due to counsel's failure to object did not affect the outcome. We agree.

 Trial counsel's failure to object to evidence is ineffective assistance only if the failure is of such a character as to deprive an accused substantially of his right to a fair trial. *State v. McKee*, 856 S.W.2d 685, 693[17] (Mo.App.1993). "Counsel renders ineffective assistance only if his conduct so undermines the proper functioning of the adversary system that the trial cannot be relied on as having reached a just result." *Id.* at 693[18].

Here, we decided under Point VI that no plain error resulted from the admission of Mrs. Stepp's testimony because Defendant failed to show manifest prejudice affecting his substantial rights. The issue presented in Defendant's seventh point is closely related to the question considered and rejected in his sixth point. On the facts of this case, our finding of no manifest injustice under the "plain error" standard on direct appeal serves to establish a finding of no prejudice under the test for ineffective assistance of counsel provided in *Strickland*. *See State v. Clark*, 913 S.W.2d 399, 406[25] (Mo.App. 1996). *See also State v. Nolan*, 872 S.W.2d 99, 104 (Mo.banc 1994); *McKee*, 856 S.W.2d at 693. Having failed to show the prejudice prong under the *Strickland* standard, Defendant has not established that he received ineffective assistance of counsel. We are not left with the definite and firm impression that a mistake was made and do not find that the motion court's findings and conclusions are clearly erroneous. Point VII is denied.

*Point IX: Newly Discovered Evidence— Lack of Jurisdiction.*

In paragraph 8 of his amended Rule 29.15 motion, Defendant alleged that the trial court lacked jurisdiction to sentence him because his conviction was based upon the perjured testimony of Bell. Continuing, Defendant's motion alleged: "[Bell] testified that [Defendant] made admissions to him regarding the deaths of Diana and Christy ..., when in fact that never happened and Bell currently admits that never happened. In light of the foregoing, by imposing sentence on [Defendant] under Counts I and II, this Court exceeded its jurisdiction...."

At the postconviction hearing, trial counsel testified that Bell contacted him after the

trial, claiming that he had lied at trial, that he had been put up to testifying by the prosecuting attorney, and he wanted to rectify the situation. Continuing, trial counsel testified that Bell ultimately signed a statement recanting his trial testimony concerning Defendant's admission that he (Defendant) killed Diana and Christy. This evidence was admitted over this objection by the State: "I have to object to all of this, as being beyond the scope of the motion." Bell did not testify at the postconviction hearing.

Defendant's ninth point asserts that the motion court erred when it rejected his claim that the trial court lacked jurisdiction to sentence him. In making this argument, Defendant acknowledges that ordinarily the claims of newly discovered evidence are not cognizable in a postconviction relief case as the motion court stated. *See Wilson v. State,* 813 S.W.2d 833, 834 (Mo.banc 1991). He insists, however, that his claim falls within the purview of *DeClue v. State,* 579 S.W.2d 158 (Mo.App.1979). The *DeClue* court explained that in certain circumstances, the general rule does not attend.

> "Allegations claiming the conviction is based upon perjured testimony which defendant contends was known to the state are controlled by a different standard."
>
> . . . .
>
> " 'In order to show perjury entitling him to post-conviction relief, the appellant must prove that the witnesses' trial testimony was false and that *the prosecution used the testimony knowing it to be false* and that the conviction was obtained because of the perjured testimony.' " (emphasis supplied).

579 S.W.2d at 159 (quoting *Voegtlin v. State,* 546 S.W.2d 40, 41 (Mo.App.1977)). *See also Coles v. State,* 495 S.W.2d 685, 687[4] (Mo. App.1973).

▮▮▮▮▮ Fatal to Defendant's reliance on the *DeClue* exception is the fact that paragraph 8 of Defendant's amended motion is without any allegation that the prosecutor or other representatives of the State knew at the time of trial that Bell was perjuring himself. Issues not raised in a postconviction relief motion are waived and cannot be raised on appeal. *State v. Green,* 798 S.W.2d

498, 507 (Mo.App.1990). By not pleading an essential element of the *DeClue* exception, i.e., that the State was aware of Bell's alleged perjury, Defendant waives his claim to postconviction relief under *DeClue. See State v. Tokar,* 918 S.W.2d 753, 769[34] (Mo.banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

Further, in *DeClue* the motion court had denied the movant's request for relief without an evidentiary hearing. The Eastern District held that allegations that the State had knowingly used perjured testimony justified an evidentiary hearing. However, Judge Reinhard explained that it is for the motion court to decide which time the recanting witness lied: "[S]hould the prosecutrix testify at the evidentiary hearing as claimed by movant, the [motion] court will be free to weigh her present testimony against her original trial testimony and thereby determine whether or not she lied at movant's trial." 579 S.W.2d at 159.

Here, of course there was an evidentiary hearing. Although Bell did not testify, Defendant's trial lawyer did testify. As part of his testimony, Defendant's trial lawyer detailed the recanting of Bell's trial testimony as told to him by Bell, including Bell's belated assertions that "he had been put up to testifying by the Prosecuting Attorney." This testimony and Bell's written recantation were received without a hearsay objection from the State. However, the State introduced contradictory evidence. The prosecuting attorney testified that it was not his practice to use testimony from a jailhouse informant "unless I have some means to corroborate, at least a portion of what he is telling me." The prosecutor explained the analysis he made before using Bell's testimony at trial:

> "There were several things, that Mr. Bell knew, when we first came into contact with him, which we could determine no manner, in which he could have received, unless he received it from the killer. Without leaping to the conclusion, at that point, that the killer wasn't necessarily, Mr. Kelley, he had to have heard it from someone, who knew the condition of one or more of the victims, and how they were killed. In

particular, he indicated, that he had been told by Mr. Kelley that there was a soft ligature strangulation, which would be a towel, a cloth, or something, as opposed to a rope, or a wire. This was something, that we believed he could not have known. It was not in news reports. That term was not used expressly, in the autopsy, that Dr. Gould gave. Although, she mentioned it to us verbally in preparation for trial. So, our belief was, that there was no way, that Lonnie Bell could have known that, unless he received the information from the person who used the soft ligature."

The motion court specifically noted and obviously relied on the prosecutor's testimony in denying Defendant's "lack of jurisdiction" claim. The court also found "significant" the fact that Bell never testified at the evidentiary hearing and offered no sworn testimony concerning his recantation and claims of prosecutorial misconduct.

▌ It is well established that deciding credibility of the witnesses is solely the responsibility of the motion court. *State v. Skelton*, 887 S.W.2d 699, 707[17] (Mo.App. 1994). A motion court is free to disbelieve testimony even where uncontradicted. *Id.* at 707[18]. Implicit in the motion court's denial of Defendant's "lack of jurisdiction" claim is its disbelief of Bell's postconviction statements that he committed perjury at the time of trial. It is not for this court to figure out when Bell was lying. *DeClue*, 579 S.W.2d at 159. We defer to the motion's court's superior opportunity to judge credibility. *Skelton*, 887 S.W.2d at 707[19]. Point IX is denied.

*Point XI: Failure To Object To "Threat" Testimony*

In Point XI, Defendant claims that the motion court erred in rejecting his claim of ineffective assistance of counsel when trial counsel did not object when Bell testified about being threatened. In rejecting this claim, the motion court said:

"First, it is not demonstrated that such an objection would have been well taken. Second, it is clear from reading the transcript that trial strategy of the Movant's trial attorneys was to use this issue to

their benefit by suggesting that this was not the only case in which Bell was offering testimony for the state. Third, the defense approach to Lonnie Bell was to paint him as a 'jailhouse snitch.' The failure to object and to make affirmative inquiry of other cases he 'snitched' in was a strategy that should not be second guessed in this proceeding."

We note that under Point X, we found no plain error resulted from the admission of Bell's testimony on this subject because Defendant failed to show manifest prejudice affecting his substantial rights. On the facts of this case, a finding of no manifest injustice under the "plain error" standard on direct appeal serves to establish a finding of no prejudice under the test for ineffective assistance of counsel provided in *Strickland. See Nolan*, 872 S.W.2d at 104; *Clark*, 913 S.W.2d at 406[25]; *McKee*, 856 S.W.2d at 693. Based on our analysis and decision under Point X, we cannot say that the motion court's findings, conclusions, and judgment are clearly erroneous. Point XI is denied.

*Point XII: Failure to Call Witnesses*

In his amended motion, Defendant alleged that his trial counsel was ineffective by "failing to develop and present the testimony of ... inmates who were in the cell block with [Defendant] and Lonnie Bell, so that those witnesses could testify" that Defendant and Bell could not and did not have conversations in which Defendant allegedly admitted his guilt. Although Defendant in his Rule 29.15 motion did not identify which witnesses his trial counsel should have called, he did produce the depositions of two Jasper County inmates, Dan Carver and Louis Crandall, at the postconviction hearing. This deposition testimony, received without objection from the State, established that both Carver and Crandall were in the same jail pod as Defendant and Bell. Their testimony, if believed, tended to show that Defendant and Bell did not and could not have had the conversations about which Bell testified.

Defendant's twelfth point maintains that the trial court erred in rejecting his claim that his trial counsel was ineffective for not presenting Carver and Crandall as witnesses.

He argues that if trial counsel had produced their testimony at trial, there was a reasonable probability that the outcome of the trial would have been different. We disagree. The trial court's findings and conclusions of law on this issue were not clearly erroneous.

■■■■ To establish claims of ineffective assistance of counsel for failing to call witnesses, a movant has to prove that the testimony of the absent witnesses " 'would have provided a viable defense.' " *State v. Vinson,* 800 S.W.2d 444, 448–49[10] (Mo.banc 1990) (quoting *Hogshooter v. State,* 681 S.W.2d 20, 21[2] (Mo.App.1984)). *See also State v. Mills,* 872 S.W.2d 875, 881[12] (Mo.App. 1994). " 'Witnesses who merely impeach the State's witnesses do not provide movant with a defense to a charged crime.' " *Mills,* 872 S.W.2d at 881 (quoting *Webster v. State,* 837 S.W.2d 585, 588[3] (Mo.App.1992)).

■■■■ In this case the alleged testimony of Carver and Crandall would not have provided Defendant with a defense, but would merely have been an attempt to impeach Bell. *See Mills,* 872 S.W.2d at 881. Moreover, it is well settled that the selection of witnesses and the introduction of evidence are questions of trial strategy. *Leisure,* 828 S.W.2d at 875[3]. To prove ineffectiveness in failing to call a witness to testify, a defendant must establish that the attorney's failure to call the witness was something other than reasonable trial strategy. *State v. Boyd,* 842 S.W.2d 899, 905 (Mo.App.1992). "A decision not to call a witness is virtually unchallengeable." *Id.*

After a thorough review of the record, we do not have a definite and firm impression that the motion court erred in denying Defendant's motion for postconviction relief. The motion court's conclusions were not clearly erroneous. Point XII is denied.[8]

The judgment in No. 20892 denying Defendant's motion for postconviction relief for the murder of Diana Kelley is affirmed. The judgment in No. 20892 denying Defendant's

motion for postconviction relief for the murder of Christy Kelley is moot.

CROW, J., and MONTGOMERY, C.J., concur.

### OPINION ON MOTION FOR RE-HEARING OR TRANSFER FOR NO. 19988

PER CURIAM.

By Motion for Rehearing Or In The Alternative Transfer, the State argues that the holdings in *State v. Ivory,* 916 S.W.2d 337 (Mo.App.1995) and *State v. Basile,* 942 S.W.2d 342 (Mo.banc 1997) stand in conflict with our decision in this case. Neither *Ivory* nor *Basile* supports the State's argument that proving motive is one of the "limited situations" which would allow hearsay testimony into evidence under the state of mind exception.

*Ivory* discussed testimony of the victim's colleagues which were statements against the interest of an unavailable witness and testimony by victim's sister which the State claimed fell under the state of mind exception. The court found that the testimony of the victim's colleagues admissible as declarations against interest tended to show defendant's possible motive. 916 S.W.2d at 339.

However, the Ivory court did not address the question of using hearsay testimony under the state of mind exception to prove motive. The victim's sister testified that, one day before his death, the victim stated he was afraid of the defendant. As to that testimony, Judge Blackmar cautioned: "It should not be assumed that evidence of the victim's state of mind is necessarily admissible." *Id.* Continuing, however, he noted that the evidence regarding victim's state of mind did not come in alone. *Id.* Rather, it was part of the overall evidence from which the jury could reasonably infer deliberation.

To explain, after the victim in Ivory expressed his fear of the defendant, his sister interceded with the defendant and obtained his assurance that he would not harm the victim. *Id.* After noting that the defen-

---

8. Defendant's thirteenth point pertains to Defendant's claim for postconviction relief from his conviction for the murder of Christy. Since that conviction is reversed, point XIII is moot.

dant's statements of assurance were not subject to the hearsay rule, the *Ivory* court said:

"The jury might conclude that the defendant lulled the victim into a sense of security so that he entered the defendant's car willingly and without hesitation, and that the defendant intended all along to do away with him, which purpose he accomplished as soon as he had the opportunity."

*Id.* It was under these circumstances that the *Ivory* court found the "whole showing" demonstrated deliberation. The Eastern District in *Ivory* did not find that hearsay testimony admitted under the state of mind exception could be used to show a defendant's motive.

The decision in *Basile* can be distinguished from this case on many levels. First, the questioned testimony in *Basile* was received without objection. 942 S.W.2d at 357. Next, this testimony was not offered to prove the truth of the matter asserted; thus, it was not hearsay. *Id.* Finally, the *Basile* testimony was not offered to establish the defendant's motive. *Id.* Thus, the *Basile* court did not find that hearsay testimony under the state of mind exception can be used to demonstrate a defendant's motive.

While Missouri cases allow the State wide latitude in proving motive, the State cannot prove motive by inadmissible hearsay that has been properly challenged. The State's motion for rehearing or transfer to the supreme court is denied.

We also deny Appellant Kelley's motion for rehearing or transfer to the supreme court without further comment.